ANNA BICK v. MARIE MUELLER, Executrix of the Estate of HENRY BOESCHEN, and MARIE MUELLER, Appellants.—142 S. W. (2d) 1021.

Division Two, September 10, 1940.*

*NOTE: Opinion filed at May Term, 1940, July 3, 1940; motion for rehearing filed; motion overruled at September Term, 1940, September 10, 1940.

*A. U. Simmons* and *Edwin Rader* for appellants.

748

*A. A. Alexander* and *L. A. Robertson* for respondent.

COOLEY, C.—This is a suit for specific performance of an oral contract to convey real estate, made by Henry Boeschen in his lifetime, in consideration of services to be rendered by respondent (plaintiff), Anna Bick. The circuit court decreed specific performance and defendant has appealed. The property in question is situated on Labadie Avenue in St. Louis. It consists of a lot with a dwelling home thereon, in which Boeschen lived at the time of making the contract. It was worth between $4250 and $4500. Boeschen owned several other parcels of real estate, the value of which is not shown. He also had personal property, the amount of which likewise is not shown, except that it appears that at his death there was a check or note (apparently solvent) for about $1850. It does not appear that he owed any debts. The total extent and value of his holdings at his death, or at the time of making the contract, is not shown.

Boeschen had but one child, the defendant Marie Mueller, who was married and living with her husband in a home of their own. His wife died in January, 1935. After her death he was left alone in his Labadie Avenue residence. He was then old—about seventy-eight—and not in good health, though able to be around. It appears that after his wife's death he felt lonely and in need of someone to look after his comfort and help him take care of his property, particularly the Labadie Avenue property. In this situation he appealed to plaintiff, a married woman living with her husband and daughter. According to the testimony of Mr. Bick, who said he was present when the agreement was made between his wife, the plaintiff, and Boeschen, on March 4, 1935, the latter said he was blue and lonesome and wanted

to know if they—the Bicks—would "room and board him" and plaintiff said she could not "room" him due to the limited room in their home. Boeschen then said he was getting tired of eating at restaurants and asked if plaintiff would give him his meals, "breakfast and supper and Sunday dinners whenever I want them if I am in town," and she said she would. Continuing, witness testified Boeschen said further:

"He said, 'I also want you to come over and help me with my household on Labadie avenue because I am getting old and can't get around like I used to,' and he said, 'My feet are bothering me and I want some one to help do my housework and laundry work and mend clothes, if necessary, and help me with my property.' Some were unoccupied and he wanted us to help clean them up, he said, 'so I can rent them;' and she said, 'Yes, I will do all of that,' and he said, 'Anna, if you will do that for the rest of my life, help me and give me my meals, I will deed or will to you upon my death one of my pieces of property,' and my wife said, 'All right,' and after awhile he said, 'Which property would you prefer, the Labadie avenue property or the place in Overland on Hawthorne?' and my wife then said she didn't care which property she would get, she would be satisfied with either one, and after a discussion he said, 'Well, since you are more acquainted with the Labadie avenue property and it is handier and closer to you, I will be glad to give you the Labadie avenue property upon my death.'"

Mr. Bick's testimony as to the making of the agreement was corroborated by the testimony of Marcella Bick, plaintiff's daughter, about seventeen years old at the time of the trial, who was present and heard the conversation. The only persons present when the agreement was made were Mr. and Mrs. Bick, their daughter Marcella, and Boeschen. According to the testimony of Mr. Bick and Marcella, Boeschen said on that occasion he had called at the Bick home for the purpose of making some arrangement if he could for plaintiff to care for and assist him. Plaintiff was not permitted to testify. Mr. Bick and Marcella testified that plaintiff began the performance of the duties she had agreed to perform the next day and continued so to do until Boeschen's death, on April 10, 1936. Both, especially Mr. Bick, described how plaintiff performed those duties. Marcella was going to school and was not so particularly cognizant of details as was her father. The latter described at length and in detail the arduous labor performed by plaintiff (and if his testimony is true it was arduous, requiring much time and labor) in cleaning up and putting and keeping in order the Labadie Avenue property in which Boeschen then lived alone and which had become rather run down and in bad order since his wife's death, and also in cleaning up and helping to keep in order the house on Hawthorne Avenue in Overland, a suburb of St. Louis, to which Boeschen moved about October,

1935, and where he thereafter lived until his death. Bick said he would take his wife to the "Hawthorne" residence where she would work, cleaning up the place, keeping it in order, cooking for Mr. Boeschen, waiting upon him as he needed, etc., and come for her in an automobile at the close of the day.

Mrs. Dorothy McGinnis testified in substance that she had known the Bicks and Mr. Boeschen practically all her life and had been a frequent visitor at the Bick home, where she often saw Boeschen when he came there for meals after March 4, 1935; that in conversations with Boeschen he told her how lonely he was after his wife's death, that "he was ill, he was sick, and he had no one to turn a hand for him and no one to keep him, said his daughter Marie would not turn a hand for him;" "that he met Mrs. Bick, 'he needed her help and he made an agreement with Mrs. Bick to take care of him, to cook his meals for him, to do his washing and ironing for him, to clean the various properties, such as cleaning and scrubbing and doing anything he asked her to do, take care of him until he died; that he would deed to her or will to her at his death the Labadie Avenue home.' " She further testified that Boeschen told her he was well pleased with what Mrs. Bick had done and was doing for him; that she was a good, hard-working woman; that he needed someone to look after him; "he always told me what Mrs. Bick had done about taking care of him and what a good woman she was." "He told me she done everything he asked her; he said she done washing, cooked his meals, and he was well satisfied and pleased with what she had done and was doing and was sorry he didn't go to Mrs. Bick's immediately after his wife's death."

It appears that for the last three or four months of his life, especially beginning in January, 1936, Mr. Boeschen was in a rapidly failing condition. He was then living at Overland. About the first of January P. F. Kirkpatrick was employed to "assist in taking care of him—in the nature of a nurse," though he was not a registered nurse. He testified that Boeschen was weak and emaciated, "had a growth on his lip" (other witnesses corroborated this) "and an open sore on his leg; that plaintiff would be out there four or five times a week; "she would do the sweeping and washing and ironing and the cooking for Mr. Boeschen and during the day she would have to take care of his bed, wash him and dress him and get him up and down to go to the bath room." He further testified that Boeschen's condition was growing worse all the time and by February "his leg was growing worse and had a terrible odor and he himself had a terrible odor;" that Boeschen had to be given enemas, which could not well be done by one person and that plaintiff assisted him in giving them; that "Mr. Boeschen had phlegm coming from his throat and we would have to put on rubber gloves and remove that," in which service plaintiff assisted. There was also evidence, which

may as well be mentioned here, that toward the last Boeschen was unable to pass his urine normally and it had to be "drawn off," in which operation, also, plaintiff would assist. Kirkpatrick also testified that about the last week in March, 1936, Boeschen told him "I have agreed with Mrs. Bick I am going to give her a piece of property on Labadie avenue for what she is doing for me." (That was but a short time before Boeschen made his will, which will be referred to later.)

Dr. Edward J. Hogan was called as a witness by plaintiff. He had attended Boeschen as his physician, visiting him often from January, 1936, till his death. He testified as to Boeschen's physical condition and to its deterioration during the last few months. This was objected to by defendant on the ground that it was privileged under the statute, Sec. 1731, R. S. Mo. 1929, Mo. Stat. Ann., p. 4011. The court overruled the objection and admitted the testimony with the reservation that, being somewhat doubtful as to its competency, if the court later concluded the testimony was incompetent it would be stricken out. Dr. Hogan further testified to seeing plaintiff at the Overland residence many times, cleaning up about the house, cooking and working in the kitchen, waiting upon Mr. Boeschen, drawing off his urine at times as need required, cleaning his bed, and generally ministering to him as the needs of such a sick man called for. Dr. Hogan also testified that Boeschen, shortly before his death, perhaps in the latter part of March, told him that he was left alone "except for Mrs. Bick and myself and Kirkpatrick and the night nurse" and he wasn't going to leave his daughter anything; that "he agreed to give Mrs. Bick this property at 4148 Labadie avenue . . . that he had it fixed up with Mrs. Bick."

There was considerable testimony other than what we have epitomized tending to show performance on plaintiff's part of the alleged agreement. On the other hand a number of witnesses for defendant, who called occasionally, but not frequently, at Boeschen's residence, gave testimony to the effect that the home was not being kept clean, that unwashed dishes would be found in the kitchen sink, the bed unmade, the interior of the house dusty, etc.—in short indications of lax housekeeping—also some testimony tending to contradict that offered by plaintiff regarding painting the Labadie Avenue house, cleaning screens, mowing the yard and other things which plaintiff tended to show she had done in the way of cleaning up the place and keeping it in order.

Four days before his death Boeschen made a will, written by a Minister of the Gospel, a friend of deceased for whom he had sent. The will is not in evidence but it seems to be conceded that by it deceased left everything he possessed to his daughter, defendant Marie Mueller, named her as executrix, that the will was probated and

that Mrs. Mueller qualified as executrix. She is sued both in her individual and official capacity.

Appellant, in her printed argument, through her counsel, says: "The defendants admit that under certain circumstances our courts have held that the Statute of Frauds should not be used as a bar or a tool to work an injustice or a fraud upon any person. The sole issue in this case is whether or not the Statute of Frauds should be operative or inoperative to the facts and testimony as presented at the trial;" and this, in final analysis, about sums up the situation, with the reservation that we must keep in mind certain applicable rules of evidence and of law that may bear upon the solution of the question suggested.

The "Statute of Frauds" referred to is apparently Sec. 2967, R. S. 1929, Mo. Stat. Ann., p. 1835 (though, evidently erroneously referred to in defendants' brief as Sec. 1967), which, so far as here concerned, provides that no action shall be brought to charge any person on a contract for the sale of lands, etc., unless same is in writing or a written memorandum thereof made by the parties, as prescribed by the statute. In this case there was no written contract or memorandum.

■ The Statute of Frauds was enacted to prevent but not to shield frauds. A court of equity will intervene to prevent a literal application which would result in manifest injustice when an oral contract, fair and conscionable, has been entered into and has been on one side fully performed. The principle is discussed at length in a lucid opinion by LAMM, J., in Berg v. Moreau, 199 Mo. 416, 97 S. W. 901. Paragraph two of the syllabus reflects the holding of the court. We quote, 199 Mo. 416:

"2. Specific Performance: Oral Contract: Statute of Frauds: Purpose. Equity will not permit the Statute of Frauds as a defense, when to allow that defense would be itself to commit a fraud against the promisee who has performed the oral contract. The purpose of the statute was not that it should be used as an aid to perpetrate a fraud. Equity does not destroy it when it steps in and prevents its use to inflict a fraud, but aids in fulfilling it." [See also, Finn v. Barnes, 340 Mo. 445, 101 S. W. (2d) 718; Mahoney v. Handley (Mo.), 250 S. W. 379; Merrill v. Thompson, 252 Mo. 714, 161 S. W. 674.]

■ Appellant practically concedes this rule but argues that in order to justify a court of equity in enforcing an oral contract for sale or conveyance of real estate the evidence showing the making and the terms of the contract and its fulfillment by the promisee must be clear, cogent and convincing, which may be conceded (see Berg v. Moreau, supra), and further argues that the evidence in this case does not measure up to that standard. We think it does.

■ The suit is one in equity, in which the appellate court may make its own findings. But, while we are not bound by the findings

of the chancellor, we do ordinarily defer somewhat to his findings where the evidence is oral, as here, and he had the witnesses before him, with opportunity to see and hear them and in better position than we can be to judge of their credibility and the weight and value of their testimony.

As to the making of the contract and its terms it does not seem to be contended that it was not sufficiently specific. (The property is accurately described in the petition and the reference to it in the evidence as the Labadie Avenue property is not challenged as insufficient.) Appellant's only contention as to the making of the contract seems to be that such fact rests upon the testimony of the husband and daughter of plaintiff, "interested witnesses." They were not disqualified as witnesses because they may have felt friendly to plaintiff. Besides we have the testimony of several non-related witnesses to statements of Boeschen that he had agreed to give the property to Mrs. Bick for caring for him.

The main contention seems to be that there was not sufficient proof that plaintiff performed her agreement. We have forecast that there was evidence on behalf of plaintiff strongly tending to show that she did, and some evidence on behalf of defendant tending to cast doubt on that question. The chancellor saw and heard the witnesses and found that issue in favor of plaintiff. Without the advantage of seeing and hearing the witnesses but from the printed record alone we would say the chancellor was right.

One other point should be mentioned. Appellant complains that error was committed in the admission of the testimony of Dr. Hogan as to Boeschen's condition as he observed it while treating him, on the ground that such information was inadmissible as being privileged under the statute. We have noted that the court admitted that testimony with some hesitancy and said it would be stricken out if the court later concluded it was incompetent. No motion to strike it out was made. On the contrary defendant fully and at length cross-examined Dr. Hogan relative to that matter. Respondent insists that defendant thus waived the error, if any, in the admission of that testimony. We shall not take space to discuss or determine the question thus raised because in this case it seems unnecessary. This being an equity case we may disregard the testimony of Dr. Hogan as to Boeschen's condition—what he may have discovered or observed in treating him—and there remains ample and practically uncontroverted evidence that during those last few months Boeschen was a very sick man, rapidly declining, requiring and receiving services of a difficult and burdensome nature. The *cause* of that condition, about which Dr. Hogan testified (he said Boeschen had cancer of the stomach and bowels and some other ailments) cannot make much difference in this case. The real point here is, did the plaintiff render to Boeschen the service she had agreed to render? If she did, and

from the evidence we think she did, it cannot matter much why Boeschen got in the condition that required the delicate and arduous services that plaintiff's evidence shows she rendered.

■ It is argued that the contract was unconscionable because the value of the property exceeded the value of the services rendered. At the time the contract was made Boeschen concededly had a life expectancy under mortality tables of 5.11 years. Of course he might have lived longer. No one could then know how long he would live, or how arduous and difficult might become the duties imposed upon plaintiff by the contract in question. She did not seek or induce the contract. Boeschen sought and procured it. He was of sound mind and under no undue influence. In a somewhat similar situation in Berg v. Moreau, supra, the court well said, 199 Mo. 416, l. c. 425, 97 S. W. 901:

"Mr. Moreau was at the time in good mental condition, and there is no evidence of any undue or improper influence. We should also consider the nature of the services agreed upon, which were performed, and which might have been required under the contract. Their value cannot well be estimated in money. The law furnishes no standard by which a money value can be placed upon them. Equity can only make an approximation in that direction by carrying out the agreement in which the parties fixed a value between themselves."

We think the judgment of the circuit court should be affirmed and it is so ordered. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at May Term, 1940, July 3, 1940; motion for rehearing filed; motion overruled at September Term, 1940, September 10, 1940.