In re ESTATE OF Bessie L. BROWN, Incapacitated-Disabled, Harold Merritt, Guardian-Conservator, Basil Ferguson, Lloyd Cowan, Bessie Elaine Smith, Bill Ferguson, Leroy Ferguson, Jeanne Erickson Meese and Nancy Williams, Appellants,

v.

Wanda FULP and Harold Fulp, Respondents.

No. 13966.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 28, 1986.

Motion for Rehearing or Transfer Denied Sept. 18, 1986.

Application to Transfer Denied Nov. 18, 1986.

Robert L. Stemmons, Stemmons & Stemmons, Mt. Vernon, for appellants.

Larry W. Meyer, Aurora, J. Edward Sweeney, Monett, for respondents.

HOGAN, Presiding Judge.

Bessie L. Brown, to whom we shall refer as Bess, was adjudged incapacitated and disabled within the intent of § 475.050, RSMo Supp.1984. Harold Merritt was appointed Guardian of Bess' person and Conservator of her estate. As such, Merritt brought this action to discover assets under the provisions of § 475.160, RSMo Supp.1984, naming Wanda and Harold Fulp as respondents. Upon motion, the trial court added petitioners Ferguson, Cowan, Smith, Meese and Williams as parties because they, together with Harold Merritt, are legatees under Bess' will dated July 16, 1981.[1] The primary object of this action was to determine the title and right to possession of personalty in the form of certificates of deposit issued by the United Missouri Bank of Monett to "Bess Brown or Wanda Fulp or survivor." The face value of these certificates was $65,300.00. After hearing evidence and receiving more than 64 exhibits the trial court ordered: 1) that the certificates (which Wanda cashed out and had reissued in her own name) be retitled in the names "Wanda Fulp or Harold L. Merritt as Conservator of the Estate of Bessie L. Brown"; 2) that ownership of the retitled certificates should be in joint form in compliance with the statutes pertaining to joint bank accounts "so that upon the prior death of Wanda Fulp the entire proceeds of [the] said certificates shall be paid to the protectee's estate; or upon the prior death of Bessie L. Brown, the entire proceeds shall be payable to Wanda Fulp"; 3) that the protectee's estate be reimbursed from the retitled certificates in an amount equal to one-half the expenditure made from the protectee's estate for the protectee's care, support and maintenance from November 15, 1983, (the date

---

1. Bess died during the pendency of this appeal, although she was living when the case was tried. Letters Testamentary were issued to Harold Merritt, and upon motion, Merritt was allowed to proceed as personal representative of the Estate of Bessie L. Brown, deceased.

of the conservator's appointment) to the date of judgment; 4) that the protectee's estate be reimbursed from the retitled certificates in the amount of $4,720.35, representing penalties incurred by Wanda for early withdrawal of the original certificates; 5) that the retitled certificate or certificates be subject to withdrawal pursuant to § 475.322, RSMo Supp.1984, for one-half the future expenditures incurred for the care, support and maintenance of Bessie L. Brown. All other issues tendered or tried by consent were found against the petitioners.

The cause was tried to the court. No findings of fact were requested and none were volunteered. We review this case in accordance with the provisions of Rule 73.-01, as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Rule 73.01.-1(b) requires us to consider all the controverted facts as found in accordance with the result.

## I

■ The briefs raise one preliminary issue without resolving it and it must be addressed by the court preliminarily. Both parties suggest that former § 491.010, RSMo Supp.1984 (now repealed), was applicable to this case, but the point is not developed. Both Wanda and Harold Fulp testified on behalf of respondent Wanda, over petitioners' objection that both were incompetent witnesses under the provisions of the Dead Man Statute, § 491.010. Petitioners' objection was not only that § 491.-010 applied, but that the so-called "administration proviso" applied. Respondents' testimony was received as a tender by question and answer as permitted by Rule 73.-01(a)(1).[2] It is necessary for us to consider the applicability of § 491.010 because in a court-tried case, an appellate court considers such of the evidence in the record as it deems admissible and excludes from consideration that evidence it deems inadmissi-

ble, *Butcher v. McClintock*, 373 S.W.2d 917, 922[4] (Mo.1963); *Kinsella v. Gibson*, 307 S.W.2d 491, 492[1] (Mo.1957), provided, of course, the evidence is *in* the record to consider. In this case, the trial court foresightedly permitted all the evidence it considered admissible for any purpose to be made of record.

The 1983 revision of the Dead Man Statute merely substituted several words for others; the word "insane" was amended to read "mentally incapacitated," and the words "executor or administrator" were amended to read "personal representative." Section 472.010(26), RSMo Supp.1983, defines personal representative to mean executor or administrator. The amendment of § 491.010 made no substantive change in the law.

When it was in existence, § 491.010 was considered to be a qualifying enactment in that it first removed the common-law disqualification of witnesses by reason of interest, and the statute was also considered a *disqualifying* statute explicitly recognizing and imposing disqualification under two provisos, usually described as the "transactions proviso" and the "administration proviso." The "transactions" proviso did not impose a general disqualification and did not make the surviving party an incompetent witness for all purposes. The witness was disqualified only to the extent that his testimony might be subject to question by the other party if living and in respect to the transactions between the witness and the party then dead or incompetent. *Fellows v. Farmer*, 379 S.W.2d 842, 849–50 (Mo.App.1964). The "administration" proviso applied to actions in which a personal representative (executor or administrator) was a party. It was limited to actions ex contractu, but when it applied, all testimony by the survivor was excluded except as to acts which occurred subsequent to the probate of the will or appointment of the personal representative. *Flanagan v. DeLapp*, 533 S.W.2d 592, 597 (Mo.

**2.** Which in pertinent part reads: " ... Where the evidence is ruled inadmissible the court upon request shall take and record the evidence in full, unless it clearly appears that the evi-

dence is not admissible on any ground or that the evidence is privileged." See: § 510.310.1, superseded by Rule 73.01.

banc 1976); *Fellows v. Farmer*, 379 S.W.2d at 849.

As to Wanda Fulp's evidence, § 475.020, RSMo Supp.1984, in very general terms makes the provisions of the probate code applicable to guardianships and conservatorships. While this section might be construed to make the "administration proviso" applicable to an action to which a guardian or conservator is a party, such construction is not justified in view of the fact that the 1983 amendments to § 491.-010 did not specifically include "guardian" or "conservator." A meticulous construction of former § 491.010 is in any case unnecessary for even if the total bar of the "administration proviso" is not applicable to Wanda Fulp's testimony, most of her evidence is inadmissible under the first, or "transactions proviso," as being subject to question or contradiction by Bess Brown if Bess were competent to testify. See again *Fellows v. Farmer*, 379 S.W.2d at 849–50.

■ Neither of the disqualifying provisos of former § 491.010 was efficient to bar the testimony of Harold Fulp. The fact that he was made a party respondent is of no consequence. The language of the first proviso disqualifies only the surviving party to the contract or cause of action in issue and on trial. Under the second proviso "the other party" has been read to mean "party to such contract or cause of action" as in the first proviso. *Davis v. Robb*, 10 S.W.2d 680, 682[4] (Mo.App.1928); *Atkinson v. Hardy*, 128 Mo.App. 349, 353, 107 S.W. 466, 467 (1908). Under the Dead Man statute, a witness was incompetent only when he was the surviving party to the contract or cause of action in issue and on trial. Being a party of record did not of itself disqualify him. *McClure v. Clements*, 161 Mo.App. 23, 25–27, 143 S.W. 82, 83[1] (1912). Harold Fulp was not a party to the transactions between his wife and Bess Brown concerning the disputed certificates of deposit and he was not disqualified by former § 491.010.

It is also abundantly clear that Harold Fulp was not disqualified by interest in the outcome of the action because his wife was a party, or because he stood to gain indirectly if his wife prevailed. *Embry v. Martz' Estate*, 377 S.W.2d 367, 371–72[3] (Mo.1964); *Bick v. Mueller*, 346 Mo. 746, 754, 142 S.W.2d 1021, 1024[6] (1940); *Ragsdale v. Achuff*, 324 Mo. 1159, 1173, 27 S.W.2d 6, 12[2] (1930); *Vosburg v. Smith*, 272 S.W.2d 297, 304[20] (Mo.App.1954). Harold Fulp's testimony was admissible and shall be considered on this appeal.

## II

In essence, this case is a "joint bank account case." Bessie L. Brown, the incompetent, was born February 8, 1889. She married one Durvich Brown and they lived for many years on a farm near Pierce City, in Lawrence County. Bess and her husband had two children, but they died in infancy. About 1960, Durvich and Bess moved to Monett. They purchased a residence known and numbered as 2 Hillcrest Drive. Durvich died shortly after he and Bess moved to Monett. When Bess and her husband acquired their house in Monett, they became acquainted with Harold and Wanda Fulp, who lived "[t]hree doors up [the street]."

Bess took care of her own financial affairs until 1978 or 1979, at which time she would have been 89 or 90 years of age, and at age 90 she solicited Merritt's assistance. At that time Bess did her banking at Pierce City. Bess had invested her cash in "a bunch of 'H' bonds and stuff." Merritt talked to the banker (in Pierce City) and discovered that the same investment in certificates of deposit would yield about 14 to 15 percent interest. Upon Merritt's advice, Bess' money was reinvested in certificates of deposit. As a matter of convenience, the certificates were made payable to Bess and Harold Merritt, and Merritt was given access to Bess' bank box. This arrangement permitted Merritt to renew the certificates when they came due, and otherwise to attend to Bess' banking affairs. Merritt resided in Pierce City. At the time he began attending to Bess' banking affairs, Merritt visited Bess once or twice a month. Bess took care of her own bills and signed

her own checks. However, during 1979 and 1980, Bess started to slip; according to Merritt, she was very deaf and became forgetful. Bess recognized Merritt when he came to visit.

According to Merritt, Wanda started preparing Bess' income tax returns as early as 1976. The exhibits indicate she did so in 1978. At some time in 1980, Merritt was at Bess' house and Bess stated she had decided to move her banking to Monett because she could get a "free lock box" in Monett. Arrangements were made to move Bess' bank account and her certificates of deposit to the United Missouri Bank of Monett. The exhibits before us indicate a deposit agreement was entered into by Bess Brown and Harold L. Merritt and the United Missouri Bank of Monett on January 4, 1980. Bess had "roughly 45,000" in certificates of deposit when she moved her banking business to Monett.

In July 1980, Bess was hospitalized briefly at the St. Vincent's Hospital in Monett. Her hospital records were received in evidence. Nothing in the records indicate that her cognitive ability was evaluated at that time. We have examined those records and find them to be of minimal importance to the issues presented. The records show that Bess was 91 years of age; that she suffered from diabetes and arteriosclerotic heart disease, but to reiterate, no impairment of her mental capacity appears.

Harold and Wanda Fulp, as we have noted, became acquainted with Bess when she moved to Monett. From Harold Fulp's testimony, we gather that he performed odd jobs for Bess from the time she moved to Monett until she was finally obliged to take refuge in a "rest home" in 1983. Sophie Reed, another neighbor, testified that Harold and Wanda Fulp obtained repairmen for Bess when she needed them and that the Fulps visited Bess very often. Harold Fulp, as we have stated, testified that at all times he did "[a]ny little thing that she needed or big thing, and so on, of course, as the years passed those things increased." Fulp's testimony was that Bess asked Wanda to look after her checkbook.

His evidence in this respect was that " ... I don't remember exactly when it was [but] my wife had a terrible time getting it to balance and getting it straightened out, it was like $400, Mrs. Brown had something, I heard my wife say that she didn't know she had, [Wanda] straightened out the account and kept it straightened out as a bookkeeper would." Fulp also testified that his wife regularly cashed checks for Bess, usually making the signed checks payable to "cash." There was considerable competent evidence that from and after April 7, 1981, Wanda managed Bess' business affairs. Wanda cashed and renewed the certificates of deposit, and as noted, wrote checks for Bess and balanced Bess' checkbook. By letter dated April 7, 1981, the United Missouri Bank was ordered to make Bess' certificates of deposit payable to "Bess Brown or Harold Merritt and Wanda Fulp." Wanda's name was also added to Bess' checking account.

On July 16, 1981, Bess executed a will. Marian Merritt—Harold's wife—obtained the services of Michael D. Garrett, an attorney who has an office in Monett. According to Mrs. Merritt, Mr. Garrett and Bess " ... went over it, and over it, and over it ... to make sure that was exactly what she wanted done, and she said 'Yes.'" A few days later, Mr. Garrett took the will to Bess' residence, where the will was executed. Wanda was not present. Essentially, the will directs that Bess' lawful debts and the expenses of her last illness be paid, and refers to marked items of personalty as bequests. Otherwise, the executor is directed to convert Bess' estate to cash and to divide the proceeds fractionally among her heirs. Harold or Marian Merritt are appointed as alternate executors. Wanda is designated as executor in case both Harold and Marian Merritt fail to serve. There is no bequest to Wanda.

The record does not contain any positive statement that the contents of the will were immediately made known to Mrs. Fulp. It is of considerable significance, however, that the certificates of deposit with which we are concerned—beginning

with Exhibits No. 51 and 52 in the amount of $6,000.00 and $24,000.00—were issued less than two months after the execution of the will, and words of survivorship did not appear on any of the certificates until that time.

There was evidence that Bess became very forgetful during 1981. Victor Murphy worked for an in-house meal service called Loaves and Fishes. This service delivered meals "to the senior citizens who [were] not able to take care of their own meals ... five days a week...." Murphy was in Bess' house in 1981 through the winter of 1982. Bess was very deaf and could not remember who Murphy was at all times. At times, Murphy found it impossible to carry on a conversation with Bess.

Mrs. Sophie Reed, who lived near Bess, was a retired school teacher. During 1981 into 1982, Mrs. Reed saw Bess every day. They had led similar lives and had a great deal in common. According to Mrs. Reed, Bess could get around the house, but she "hung on to the furniture going around the house, and got along that way until she got [a] walker." Bess became increasingly forgetful; she could not remember when to take her medicine; she occasionally forgot how to do simple subtraction. Bess frequently made offers of gifts to Mrs. Reed. Bess gave Mrs. Reed her piano and "anything [else] in the living room that [Mrs. Reed] wanted." Bess also spoke frequently of her family; she was proud of them and her attitude never changed. Basil Ferguson, Bess' nephew, testified that Bess' memory was spotty; on one occasion he took pictures of his "ancestors" to Bess to have them identified. On one occasion Bess was unable to identify anyone; on another occasion, she identified everyone in the various pictures. Ferguson also testified that Bess frequently attempted to make gifts of personal items. Bess gave her piano to Ferguson's wife, to Mrs. Reed four or five times, and possibly to other

people. She also gave an antique china cupboard to Ferguson's mother, to Mrs. Merritt and to two or three other people.

In the first part of March 1983, Ferguson saw Bess, who was thinking of going to a rest home. Ferguson asked Bess if she still had Harold Merritt's name on her bank account and on her certificates so Merritt could attend to her affairs. Bess assured Ferguson that she did. In March of 1983, Bess was admitted to a rest home. Merritt and his wife made arrangements for Bess' admission. Wanda took Bess to the Camden Health Care Center.

Merritt attempted to obtain Bess' checkbook from Wanda, but was unsuccessful. Merritt then went to the United Missouri Bank at Monett, where he was advised that his "name had been taken off [the] checking account, taken off of the CD's."

Merritt testified that when he made this inquiry, he had no inkling that his name had been removed from the bank account or from the certificates. After Bess entered the rest home, Merritt decided that he or some member of the family should resume managing Bess' affairs. Merritt approached Mrs. Fulp about this time. The two had a conversation in Wanda's office. Merritt told Wanda that he intended to have Bess "declared incompetent and get those certificates back."[3] Wanda's version of this encounter[4] was that Merritt presented himself at her office to say that he had been to United Missouri Bank. Merritt told Wanda that United Missouri "wouldn't let him in." Wanda told Merritt that his name "had been removed" from the certificates. Merritt thereupon declared: "'Well, I'll have Aunt Bess declared mentally incompetent, and that will be no problem, I will take all of her money and move it back to the Citizen's National Bank and handle it myself.'" Wanda replied: "'You couldn't do this with that little lady could you?'" Merritt replied that he could.

**3.** The quoted language is counsel's.

**4.** Bess was not present when this conversation took place; the discussion itself was a matter with which Bess had no direct connection and of which she had no knowledge. We therefore regard Wanda's conversation out of Bess' presence as admissible.

Basil Ferguson thereupon instituted a competency proceeding in the Probate Division of the Circuit Court of Lawrence County on April 11, 1983. Wanda and Harold Fulp actively opposed any declaration that Bess was incompetent. Harold Fulp testified on her behalf; in fact, he intervened, with counsel. At the close of petitioners' evidence, counsel for Fulp moved to dismiss, the attorney representing Bess joined, and the petition was dismissed on June 21, 1983.

Bess remained in the rest home. In September 1983, she suffered a "stroke." On November 15, 1983, another incompetency hearing was commenced in the Probate Division of the Circuit Court of Lawrence County. Between the time Bess suffered the stroke and the time of hearing in the second incompetency proceeding, respondent Wanda Fulp "cashed" eight certificates of deposit (before us as petitioners' Exhibits 40, 41, 42, 51, 52, 54, 56 and 58) in the total amount of $65,300.00. All the certificates were made payable to "Bess Brown or Wanda Fulp or survivor." Because the certificates were liquidated before the due date, an "early withdrawal" penalty in the amount of $4,072.43 was incurred. New certificates in Wanda's name were issued in the amount of $59,000.00. After Merritt was appointed Guardian and Conservator of the estate, this proceeding followed.

### III

In this court, the petitioners have briefed and argued five assignments of error. Their first point is that the court erred in retitling the certificates of deposit in the names of " 'Wanda Fulp or Harold L. Merritt as Conservator of the Estate of Bessie L. Brown' because, contrary to the law, Bess Brown was deprived of her ownership rights in the certificates of deposit for the reason that the evidence showed that Bess Brown was the sole source of the funds, Bess Brown did not intend to establish a survivorship estate with respondent Wanda Fulp, and Bess Brown did not consent to the withdrawal of the funds." The respon-

dents' answer is essentially that there is nothing in the evidence to indicate that it was not Bess Brown's intention to create a survivorship interest in the certificates of deposit.

■ We must look first to the nature of the instruments in issue. They are eight certificates of deposit, before us as Exhibits 40, 41, 42, 51, 52, 54, 56 and 58 in the total face amount of $65,300.00. Each of the certificates is made payable to "Bess Brown or Wanda Fulp or survivor." Each of the certificates is marked "Not transferable." Conditions of payment are recited. Each of the certificates bears the signature of at least one bank officer, but there is no contemporaneous agreement fixing the rights of the parties in the account. If there are by-laws of the United Missouri Bank governing the right to withdrawal or regulations purporting to define the interests of the joint depositors, they are not before us nor were they put before the trial court. We conclude the instruments are a species of time deposit and because they are specifically marked "not transferable" they are not negotiable instruments within the meaning of § 400.3–116, RSMo 1978. Inasmuch as the certificates of deposit are simply time certificates, they are "joint deposits" within the meaning of § 362.470, RSMo 1978.

■ The petitioners vigorously argue that during the life of the joint depositors, the intention of the parties may be shown to defeat the provisions of § 362.470.1 and the effect of *In re Estate of LaGarce*, 487 S.W.2d 493 (Mo. banc 1972). In support of this contention, the petitioners cite us to *Peters v. Carr*, 654 S.W.2d 317 (Mo.App. 1983), and *Carroll v. Hahn*, 498 S.W.2d 602 (Mo.App.1973). In *Carroll*, the Eastern District held that *LaGarce* did not abolish the rule that during the lives of the parties the recitation of joint interest "readily yields" to evidence of the real intention of the parties. In *Peters*, 654 S.W.2d at 321–22, the Western District accepted the Eastern District's interpretation of *LaGarce*. *Peters v. Carr*, 654 S.W.2d at 322. For the purposes of argument, we accept the prece-

dents cited for the proposition that during the lives of the joint depositors, the real intention of the parties may be shown to defeat a recited joint and survivorship interest.

Even so, the appeal at hand presents only a factual question. By prodigious effort, junior counsel for the petitioners has shown that Bess contributed all the funds which were used to purchase the certificates of deposit which are now claimed by the estate. There is evidence that originally, the certificates were made payable to Bess, Harold Merritt or Wanda Fulp as a convenience, because Wanda could attend to Bess' business affairs more readily than Merritt. However, beginning with certificates numbered 19134 and 19135, the certificates were made payable to "Bess Brown or Wanda Fulp or survivor." Bess was in poor health; she had recently executed a will. Harold Fulp testified that Bess had discussed the effect of her will and that Bess "wanted the relatives to have the things that were provided in the will" and " ... she wanted Wanda to have the money." Such declaration was admissible to show a state of mind—here Bess' reason for making the certificates payable to the survivor—and tended to show the reasons for Bess' action in adding survivorship language to the certificates. *State ex rel. Smith v. Hughes*, 356 Mo. 1, 4, 200 S.W.2d 360, 361[2] (banc 1947); *Estate of Stanley*, 655 S.W.2d 88, 92 (Mo.App.1983). Such evidence had nothing to do with the question of undue influence, but was admissible upon the question of intent, which is raised by this point. There is other evidence of Bess' affectionate feeling toward Wanda Fulp and the trial court could reasonably have concluded it was her intention to utilize a joint bank account as an additional testamentary device. There was, therefore, no error—for the reason asserted—in retitling the joint accounts in the name of Wanda Fulp and Harold Merritt as Conservator of the Estate of Bessie L. Brown, and in providing that appropriate words of survivorship should be added because § 362.470.4, RSMo 1978, plainly provides that the adjudication of incompetency of any one or more joint tenants shall not operate to sever or terminate the joint tenancy or any part thereof.

## IV

The petitioners' second assignment of error is that the certificates were procured by the exercise of undue influence by Wanda Fulp, and apparently it is their contention that the entire amount of the certificates should have been paid into the estate of Bess Brown. Here, it is important to bear in mind the general nature of the doctrine of "undue influence."

The idea of undue influence developed as an equitable doctrine and is not susceptible of precise definition. D. Dobbs, Remedies § 10.3, p. 672 (1973). However, as Professor Dobbs points out, "[t]he victim of undue influence is entitled to the same battery of restitutionary remedies as the victim of fraud or other wrongdoing," including avoidance of an instrument procured by exercise of undue influence. Merritt and the other petitioners have, or had, a legally protectible interest in the certificates if the survivorship interest therein was procured by the exercise of undue influence. Their expectancy under the will executed by Bess Brown is protected by the express terms of § 475.160, RSMo 1978.

As the appellants argue, our courts have held that a presumption of the exercise of undue influence arises when there is evidence that the donor and donee, or "benefactor and beneficiary" stood in a relationship of confidence and trust and there is evidence, other than the existence of a confidential relationship from which the exercise of undue influence may be inferred. *Davis v. Pitti*, 472 S.W.2d 382, 388[7][8] (Mo.1971); *In re Estate of Hayes*, 658 S.W.2d 956, 958[4, 5] (Mo.App.1983); *Obermoeller v. Speck*, 544 S.W.2d 21, 23[2, 3] (Mo.App.1976). A confidential relationship exists when one person relies upon and trusts the other with the management of his property and attendance to his business affairs, thereby creating some degree of fiduciary obligation. *Davis v. Pitti*, 472

S.W.2d at 387; *Estate of Ferling*, 670 S.W.2d 109, 112[6] (Mo.App.1984); *Flynn v. Union National Bank of Springfield*, 378 S.W.2d 1, 10–11[14] (Mo.App.1964). "Undue" influence is defined as that influence which by force, coercion or overpersuasion destroys the free agency of the benefactor. *Davis v. Pitti*, 472 S.W.2d at 387[6]; *Wilhoit v. Fite*, 341 S.W.2d 806, 813[1] (Mo.1960). Because undue influence "is not proclaimed from the housetop ...," *Wilhoit v. Fite*, 341 S.W.2d at 813, and direct proof thereof is difficult, if not impossible to obtain, proof of undue influence may be made circumstantially. *Pasternak v. Mashak*, 392 S.W.2d at 631 (Mo.App. 1965). Once the proponent has raised a presumption of the exercise of undue influence, he has made a prima facie case which does not disappear even when countervailing evidence is introduced. *Simmons v. Inman*, 471 S.W.2d 203, 206[2] (Mo.1971); *Carroll v. Knott*, 637 S.W.2d 368, 370 (Mo. App.1982). The important principle to remember on this appeal is that raising the presumption of undue influence presents an issue for the trier of fact. *Loehr v. Starke*, 332 Mo. 131, 142, 56 S.W.2d 772, 776[3] (banc 1932); *Simmons v. Inman*, 471 S.W.2d at 206; *Pasternak* at 636[4]. To reiterate the exercise of undue influence, in the final analysis, is always a *factual* question.

Whether the gift or benefaction is an inter vivos transfer or testamentary disposition, our courts have considered it important to determine whether or not the person standing in a relationship of trust and confidence to the donor or testator was active in procuring the benefaction. Such activity is considered proof of the exercise of undue influence. *Simmons v. Inman*, 471 S.W.2d at 206; *In re Estate of Stanley*, 655 S.W.2d at 90. If, on the other hand, it may be inferred from the evidence that the donor was motivated by a genuine preference for the object of her bounty and that the beneficiary was acting at the direction of his benefactor in procuring the gift, the gift or bequest will be sustained. *Cf. Estate of Linck*, 645 S.W.2d 70, 75–76[6][7, 8] (Mo.App.1982). The physical and mental condition of the donor is highly material upon the issue of undue influence, but the capacity to make a gift exists if the donor or benefactor has the capacity to know and understand, in a reasonable manner, the nature and effect or the consequences of the act involved; a reasonable understanding of the donor's property and effects, and an understanding as to who are the natural objects of the donor's bounty. *In re Estate of Ferling*, 670 S.W.2d at 111; *Flynn v. Union National Bank of Springfield*, 378 S.W.2d at 6. Many other considerations have been stated as being relevant. Orderly disposition of the appeal does not require that we undertake to state all such relevant factors.

### V

█ There is no doubt whatever in this case that from the time Wanda began looking after Bess' business affairs in 1981, a relation of confidence and trust existed between Bess and Wanda Fulp. It may literally be said that Wanda attended to all Bess' affairs.

The appellants argue that Bess' physical condition and her confused mental state made her easily subject to undue influence. There is no doubt that Bess was a very old woman; she was, as we calculate, 92 years of age in September 1981, by which time her confidential relationship with Wanda had developed. Bess suffered from various ailments; she was occasionally forgetful. She had a tendency to give friends or members of the family particular chattels over and over again. Further, there was evidence that she occasionally forgot or could not remember how to make arithmetic calculations, but the record taken as a whole also indicates she was never any great shakes with figures. One may concede that Bess was very old and that her faculties in some respects had deteriorated. Nevertheless on June 21, 1983, when Bess was 94 years old, the Probate Division, after hearing, determined that Bess was not an "incompetent," which under the statute then in force, Laws of Mo. 1979, p. 624, meant that Bess was not a " ...

person ... incapable by reason of insanity, mental illness ... senility ... or other incapacity, of ... managing [her] property." Bess was present at the time the inquiry was held; she was represented by competent appointed counsel. No jury trial was held, but we are nevertheless convinced that the due process requirements codified as § 475.075 and recently addressed by our Supreme Court *In Re Link,* 713 S.W.2d 487 (Mo.1986), were substantially satisfied. The Probate Division's dismissal of the competency hearing on June 21, 1983, was not conclusive and we do not suggest as much. However, it was certainly relevant and competent evidence tending to establish Bess' capacity to make a gift or a testamentary disposition of her property.[5] Therefore, there is a factual basis for an inference that Bess was old and feeble, but nonetheless was possessed of the mental capacity to make a gift or a testamentary disposition of her property.

## VI

Many adjudicated cases, as we have said, lay emphasis on the activity of the beneficiary in procuring the transfer or disposition of assets. The petitioners called several employees of the United Missouri Bank of Monett, and sought to suggest that Wanda perpetrated a species of equitable fraud in procuring the certificates.[6] The petitioners consider it particularly significant that on some of the certificates of deposit, the words "or survivor" were obviously added on a different typewriter. Georgia Ann Wormington, an employee of the United Missouri Bank, was called as a witness. She was asked about the certificates of deposit which appear as petitioners' Exhibits 40, 41 and 42. These exhibits are certificates of deposit in the total face amount of $26,000.00. The witness' attention was called to the words "or survivor" which appear on the three certificates. The gist of Ms. Wormington's testimony was that on at least three of the certificates, the words "or survivor" were added on another typewriter after the face date of issue. The witness also related that "Wanda was in [the bank] one day," and noticed that the words "or survivor" were being added to certificates of deposit. Wanda asked the witness "You know, do they need to be [added to] the other certificates"? The witness had said "You do whatever you want ... about it." Ms. Wormington's testimony is subject to the inference that the words "or survivor" were added to three certificates after the date of issue at Wanda's direction, but her evidence is also larded with phrases like "I hope I recollect right on this" and other indications of uncertainty.

The petitioners also had the evidence of other bank employees, in particular that of Betty Francisco. Ms. Francisco was an assistant vice-president of the United Missouri Bank of Monett. She agreed with witness Wormington that the words "or survivor" had been added to some of the certificates "at a later date." The employees of the bank all indicated that when certificates of deposit were purchased, Bess and Wanda came to the bank together. At some time during the period when the certificates of deposit were issued— 1981 and 1982—the employees were instructed by the bank's counsel to add the words "or survivor" if the depositors wanted that done. Beginning in 1982, Ms. Francisco testified, United Missouri had simply

---

5. *Slaughter v. Heath,* 127 Ga. 747, 57 S.E. 69, 73–74[5] (1907); *In re Van Houten's Will,* 147 Iowa 725, 124 N.W. 886, 888–89 (1910); 5 Wigmore, Evidence § 1671 (Chadbourn rev. 1974). See also *King v. Gilson,* 191 Mo. 307, 90 S.W. 367 (1905) (proof of appointment of guardian not conclusive on issue of testamentary capacity, but subject to rebuttal).

6. Equitable fraud is not the same species of delict as legal fraud, but if Wanda purchased certificates of deposit payable to Bess or herself or survivor contrary to Bess' intention, or procured the addition of the words "or survivor" after execution of the certificates without Bess' knowledge, then Wanda could be found to hold all the funds as constructive trustee. *Pollock v. Brown,* 569 S.W.2d 724, 730 (Mo. banc 1978). The concepts of undue influence and equitable fraud, though distinct, are often intermixed in the same transaction. See D. Dobbs, op. cit. at 672 n. 2.

added the words "or survivor" to certificates of deposit unless some different instruction was given. Ms. Francisco testified that when she issued certificates to Bess and Wanda, she would "explain" the certificates. She always spoke loudly to Bess because Bess was very deaf. However, Ms. Francisco explained how the certificates were "made out, the date they were issued, the amount, [the] maturity date, the [interest] rate they were being paid and how the interest was [being] paid." Ms. Francisco indicated that Bess and Wanda "would decide between the two of them what they were going to do with [the certificates]." However, Ms. Francisco did not recall ever having discussed the meaning or implication of the words "or survivor" with Bess Brown.

The other evidence and particularly the oral testimony could be recounted at tedious length, and the possible inferences could be surveyed in the same manner. Perhaps the trial court could have concluded that Wanda Fulp insidiously and purposefully took Bess in tow in order to take advantage of the confidential relationship between the two. However, it is also a permissible and reasonable inference that Bess wanted Wanda to have part of her estate. Without any clue to the trial court's reasoning process, we cannot confidently say that any of the four grounds for reversal enumerated in *Murphy v. Carron*, 536 S.W.2d at 32[1–3], exist.

Perhaps the words "or survivor" were not added at the very moment the certificates of deposit were issued, but there is nothing inherently sinister in such evidence. Commercial banks are no longer the citadels of infallible accuracy they once were, and our courts have indicated a certain degree of informality in creating or changing or revoking a joint bank account is to be tolerated. *McGee v. St. Francois County Savings and Loan Ass'n*, 559 S.W.2d 184, 187, 188[2][3] (Mo. banc 1977). Further, though delivery of control of the certificates may not have the significance it once did, Bess effected a symbolic delivery by giving Wanda access to the safe deposit box in which the certificates were kept and

by denying Merritt access to the box contemporaneously.

Wanda exhibited every appearance of impropriety by cashing out the certificates before the second competency hearing. However, this court cannot void the certificates upon the literally proverbial principle that "The wicked flee when no man pursueth...." Proverbs 28:1 (King James rev. 1611). Wanda breached her fiduciary duty to keep the jointly-owned fund intact when she cashed out the certificates, but she was ordered to make restitution, a remedy as appropriate as the constructive trust for which the petitioners contend. See D. Dobbs, op. cit. at 673. To sum up, the petitioners undoubtedly made a prima facie case, but there was countervailing evidence which the court was entitled to believe. We therefore find no error in retitling the certificates of deposit in the form "Wanda Fulp or Harold L. Merritt as Conservator of the Estate of Bessie L. Brown," nor was there error in ordering that the certificates be made payable to Wanda upon the death of the protectee. Further, what we have said is sufficient to dispose of petitioners' point III.

## VII

The petitioners further complain of an allowance of $1,225.00 as attorney's fees to J. Edward Sweeney for services rendered to Harold Fulp and Wanda Fulp. While we are extremely reluctant to disallow an award of attorney's fees in any case, the petitioners' point is well taken here. There is no *competent* evidence in the record that Mr. Sweeney was employed by Bess Brown; he appeared as attorney for Harold Fulp and Bess was represented by Ms. Susan Appelquist, known to this court to be a very competent attorney. There is nothing in *In re Link, supra*, which suggests to us that Bess was entitled to *two* attorneys and there is certainly no indication that Ms. Appelquist did not act with care to safeguard and advance the interest of her client. The point is well taken.

The petitioners also maintain that the trial court erred in failing to order Wanda Fulp to make restitution for all moneys withdrawn from checking accounts 024–074 and 028–169 "because said judgment was against the weight of the evidence in that said checks were signed by Bess Brown but written by respondent Wanda Fulp, were made payable to 'cash' and were endorsed by respondents Wanda Fulp and Harold Fulp and respondents did not account for the proceeds by competent evidence."

The petitioners' evidence tended to show that when Bess began doing business at the United Missouri Bank of Monett, she established a bank account in the names of Bess Brown or Harold Merritt. This account was established April 4, 1980. On March 23, 1982, this account was closed and a new checking account, account number 028–169, was opened in the names of Bess Brown and Wanda Fulp. From July 1, 1981, to January 25, 1983, checks in the amount of $1,300.00, according to the petitioners, were made payable to cash. The checks were endorsed by Harold Fulp, although Bess signed the checks. In August and December 1982, checks were signed by Bess Brown, filled out by Wanda Fulp and were made payable to "cash." Citing us to *Peters v. Carr*, 654 S.W.2d 317, and other similar precedents, the petitioners claim Wanda should have been ordered to account for the amounts expended.

Harold Fulp offered a reasonable explanation for the expenditure of funds questioned by the petitioner. Occasionally, Bess needed cash. The cash was procured by Harold or Wanda Fulp, at Bess' request. If Harold Fulp's explanation was accepted by the trial court, there was no "appropriation" of funds belonging to Bess Brown. The precedents cited are not controlling, and there is no merit in the point.

## VIII

Having decided that the evidence is sufficient to support a finding by the trial court that the joint certificates were not procured through the exercise of undue influence or constructive fraud, we turn our attention to the form of the judgment. One aspect of the judgment is not sufficiently definite to be enforced without further resort to the record. That indefiniteness should be corrected. *Cf. Loveland v. Henry*, 700 S.W.2d 846, 849 (Mo.App.1985). The amount of contribution to Bess' expense ordered by paragraph D should be ascertained and made certain. If execution should issue for the payment of the sum to be ascertained regarding paragraph D, it should be ordered. The attorney's fee claimed by Mr. Sweeney should be disallowed. Additional evidence may be heard, if necessary. We recognize that when no further factual adjudication is required, this court has the authority to render the judgment which should be entered. Rule 84.14; *Vilelle v. Reorganized School Dist. No. R–1*, 689 S.W.2d 72, 77[14] (Mo.App.1985). Nevertheless, further factual adjudication is necessary to determine the rights of the parties finally and to avoid further litigation. Appellate courts as such have no adjudicative powers; they may act only upon the record presented. *City of Joplin v. Village of Shoal Creek Drive*, 434 S.W.2d 25, 28–29[4–7] (Mo.App.1968). Accordingly, for the reasons and for the purposes stated, the cause is remanded.

CROW, J., concurs specially.

MAUS, J., disqualified.

PREWITT, C.J., dissents.

CROW, Judge, concurring.

I concur. While there is evidence that might have persuaded me—had I been the trial judge—that (a) Bessie L. Brown was incompetent when Wanda Fulp's name was added to the certificates of deposit, or (b) the addition of Wanda Fulp's name to the certificates of deposit resulted from undue influence over Mrs. Brown by Wanda Fulp, I cannot say that the evidence was so overwhelming that the trial court erred in failing to make either of those findings. There was, in my view, sufficient evidence to support the trial court's judgment, except as to the attorney fee for Mr. Swee-

ney. Consequently, mindful of the scope of our review as defined by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), I concur in the principal opinion.

PREWITT, Judge, dissenting.

I respectfully dissent.

I agree that there was evidence to support the trial court's determination, but I believe that determination was against the weight of the evidence and that we should set aside the judgment because of "a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

There was a confidential relationship between Mrs. Brown and Mrs. Fulp and I believe that Mrs. Brown was unduly influenced by Mrs. Fulp. I also think that as the evidence did not establish that the words, "or survivor" were added to certain of the certificates of deposit by Mrs. Brown's express authorization, then that language was invalid.

I would reverse the judgment and order that the funds be paid to Mrs. Brown's estate.