Greta Warren WATSON, Robert L. Warren, Charlene Warren Merrick, Pat Duff Wheeler, Rita Duff Stuckey and Anna Marie Duff French, Petitioners–Appellants,

v.

Harry WARREN, Jr., Defendant–Respondent.

No. 15151.

Missouri Court of Appeals, Southern District, Division Two.

May 27, 1988.

G.H. Terando, G.H. Terando & John Thomas Welch, Poplar Bluff, for petitioners-appellants.

Jeffrey C. Vaughan, Charleston, for defendant-respondent.

MAUS, Judge.

In this proceeding to discover assets, the petitioners seek to compel the respondent to restore to the estate certain assets allegedly obtained from the decedent Eva Warren by undue influence. The cause was tried to the court. The court made a general finding the respondent did not exercise undue influence and entered judgment for him. Petitioners state three points on appeal.

Harry Warren, Sr., and Eva Warren were married August 15, 1917. Harry Warren, Sr., died in February, 1976. He left surviving his widow Eva Warren, and children Harry Warren, Jr., Robert L. Warren, Greta Warren Watson, Charlene Warren Merrick and Ethel Warren Duff. Eva Warren succeeded to jointly owned property of the approximate value of $256,000. This included a bank account of $47,197 and a certificate of deposit for $100,000.

Following her husband's death, Eva Warren continued to live in the family home. She had always refused to stay alone and paid companions lived with her. Eva suffered from arteriosclerotic heart disease. Her condition deteriorated and upon the advice of her physician she moved to a nursing home on April 30, 1981.

On November 17, 1976, Eva Warren executed a will devising her estate in equal shares to her five children. Harry Warren, Jr., and Ethel Duff were named coexecutors. Her financial transactions after the death of her husband include the following: In May, 1977, she gave a rental agreement and an option to purchase real estate to Boyd Duff and Ethel Duff. Options to purchase real estate were also given to Harry Warren, Jr., and Robert L. Warren. Robert L. Warren purchased the homeplace for $40,000 and received the deed in 1981. In 1981 Eva Warren sold Boyd Duff 80 acres for $30,000. The other children did not receive options.

On March 19, 1980, certificates of deposit for approximately $218,115 in the name of Eva Warren were placed in the names of Eva Warren or Harry Warren, Jr., either or survivor. Thereafter, generally those certificates were reinvested and together with interest on them placed in the joint names of Eva Warren or Harry Warren, Jr., either or survivor. Eventually, these funds were.

placed in the names of Eva Warren, Harry Warren, Jr., or Julia Warren, either or survivor. Julia Warren is the wife of Harry Warren, Jr. In 1981 proceeds of a certificate in the amount of $75,000 were paid to respondent. In addition, in January, 1981, $32,000 was transferred from the account of Eva Warren and placed in the account of Harry Warren, Jr. Some interest checks were also placed in the account of Harry Warren, Jr. In April, 1981, Eva Warren assigned the title to her 1977 Cadillac to Harry Warren, Jr.

Eva Warren died February 24, 1982, at the age of 82. Ethel Duff had predeceased her mother. Eva Warren's will was admitted to probate and Harry Warren, Jr., was appointed sole executor. The appraised value of the estate of Eva Warren was $39,567.96. This proceeding was instituted by the petition of Robert L. Warren, Greta Watson, Charlene Merrick and the children of Ethel Duff. It is not clear that Robert L. Warren or Charlene Merrick appeared. They did not testify. As stated, the petition seeks to recover for the estate assets of Eva Warren transferred to Harry Warren, Jr. The petitioners allege Harry Warren, Jr. "in order to promote and facilitate his exclusion and concealment of these assets, exercised undue influence upon the Decedent prior to her death and coerced the transfer of certain assets away from the Decedent and did so in a breach and exploitation of a confidential relationship with the Decedent."

■ The propositions of law governing the disposition of this appeal are axiomatic. Not all influence is undue influence. Hanna & Borron, 5 Mo.Prac. § 122 (1988). "For our purposes, 'undue influence' may be defined as that influence which, by force, coercion or overpersuasion destroys the free agency of the grantor, settlor or donor to act." *Matter of Estate of Soper*, 598 S.W.2d 528, 538 (Mo.App.1980). Whether or not a transaction is the result of undue influence is a factual question. *Estate of Brown v. Fulp*, 718 S.W.2d 588 (Mo.App.1986). Facts from which the exercise of undue influence is often inferred are discussed in the cases and texts and will

not be restated. See *Kaiser v. Pearl*, 670 S.W.2d 915 (Mo.App.1984); *Matthews v. Turner*, 581 S.W.2d 466 (Mo.App.1979); Hanna & Borron, 5 Mo.Prac. §§ 124 to 130, supra. The burden to establish undue influence was upon the petitioners. *Hodges v. Hodges*, 692 S.W.2d 361 (Mo.App.1985). "In cases tried without a jury ... [o]n appellate review ... [d]ue regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses...." Rule 73.01. "Where no findings of fact and conclusions of law had been requested by the parties, or made by the court, all fact issues are deemed found in accordance with the results reached." *Consumers Oil Co. v. Spiking*, 717 S.W.2d 245, 250 (Mo.App.1986). The judgment of the trial court is to be sustained "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ The petitioners' first point is that the judgment of the trial court is against the weight of the evidence. To support that point they cite evidence such as the following: evidence that at the time of the transactions in question the decedent was in her eighties; she was in poor physical health suffering from the progressive condition of arteriosclerotic heart disease; and she was mentally confused and disoriented. The petitioners place particular emphasis on medical records to the effect she was senile and confused and testimony that she did not recognize relatives and spoke of the dead as if they were living. They cite evidence that Ethel Duff had been assisting the decedent with her financial affairs. However, Ethel Duff and Julia Warren had a quarrel. Thereafter Julia Warren handled the decedent's financial affairs. They characterized this event as a quarrel precipitated by Julia Warren. They argue the transactions in question did not occur until three years after the respondent and his wife "had assumed complete control of the decedent's life and her needs." Greta Watson testified that Eva Warren declared that she hoped the respondent would not find

out how much money she had because he would want to borrow it. Eva's sister-in-law testified that in 1977, Eva Warren came to her home crying and said that the respondent and his wife wanted all of her money and would put her in a nursing home. In 1977 Eva Warren refused to sign a power of attorney in favor of respondent. They state "there was no evidence that the Respondent's wife was solicitous of the decedent at anytime except for the three-year period before her husband's name was placed on $170,000 worth of certificates of deposit." Petitioners insist the evidence shows that Harry Warren, Sr., and Eva Warren had always treated their children equally. In addition, without any evidentiary support for the same, the petitioners suggest that the influence of the respondent and his wife was the explanation "why witnesses like Dr. Rodriguez would virtually impeach themselves in the face of their own medical records and notes." On the other hand petitioners insist that witnesses favorable to their position were impartial.

To counter, the respondent argues that the petitioners have unfairly characterized the evidence and ignored the evidence contrary to their position. The respondent cites evidence such as the following.

The defendant was a proud, strong-willed and independent woman. One of the decedent's companions said the decedent was not too forgetful and always recognized people. She was about the same when she entered the nursing home. Until sometime in 1980, the decedent drove her own car. When she could no longer drive, she gave accurate directions on where she wanted to go. Petitioner Rita Duff Stuckey testified Eva knew what she was doing when she sold 80 acres of land for $400 per acre in 1981 to her father, Boyd Duff. Her physician of many years testified that her deterioration was more physical than mental. The vice president of the bank who had known the decedent for 39 years saw her in the bank on occasion after Harry Warren, Sr., died. On those occasions the decedent seemed coherent, she knew what she wanted to do and instructed her about the same. There was evidence the decedent never spoke in derogatory terms of any of her children and other evidence to discount the declarations the petitioners referred to. Julia Warren explained that she started helping the decedent with social security payments for her domestic employees. On one occasion, at the request of the attorney handling the Estate of Harry Warren, Sr., Julia delivered a document to the decedent for signature. Ethel Duff looked at it and became very angry with her. Apparently Ethel Duff quit assisting Eva. From that time on Julia Warren assisted the decedent in making out her checks and keeping her bills paid. Contrary to the petitioners' assertion, there was evidence that Julia Warren had assisted Harry Warren, Sr., and Eva Warren for many years. For example, she assisted with their fiftieth wedding anniversary. In 1967 she stayed with Eva Warren during the St. Louis hospitalization of Harry Warren, Sr. She took Harry Warren, Sr., and Eva Warren to the hospital in 1972.

After the death of Harry Warren, Sr., the virtually undisputed evidence established that Harry Warren, Jr., and Julia Warren rendered assistance needed by Eva Warren on an almost daily basis. For example, they saw that her companions were present for work, they saw to the maintenance of Eva's home and appliances and they bought her personal items. Two of the children lived at a distance and visited on holidays. Petitioner Robert Warren lived very near his mother but did not assist her, in fact he seldom visited her. One companion testified that Eva wondered why her children, other than Harry Warren, Jr., did not come to see her. Eva often saw Robert Warren drive by and wondered why he did not stop. Eva became very fond of Harry Warren, Jr.'s son and his family who lived across the road. Eva Warren declared that Harry Warren, Jr., was her favorite and that he was her "right-hand man."

The respondent explained that all of the children had not been always treated equally. He started work when he was 14. He always contributed to his parents' financial needs. He was in business with his father

for many years and did most of the work, but divided the proceeds. He bought automobiles for his parents. His father had by substantial sums financed business ventures for Robert Warren. The father had also financially assisted his son-in-law, Robert Merrick. His parents provided financial assistance to the other children. On one occasion Eva Warren drove to his house and asked him to drive her to the bank. She said that she wanted to even things up. He drove her to the bank and she was waited on by a Mr. Hines. Mr. Hines did not testify. At decedent's direction, Harry Warren, Jr.'s name was added to the certificates of deposit.

As stated, whether or not a transaction is to be determined to be the result of undue influence is a factual question. The evidence on this issue was contradictory. By its general finding, the trial court resolved the conflict and issue of credibility in favor of the respondent. "[I]n court tried cases where the evidence conflicts sharply, appellate courts resolve the conflict by according due deference to the trial court because of its superior opportunity 'to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony.'" *Long v. Lincoln,* 528 S.W.2d 512, 513 (Mo.App.1975). Heeding this admonition, this court finds the judgment of the trial court was not against the weight of the evidence.

Petitioners' second point is that there was no substantial evidence to support the judgment of the trial court. The burden of proof of the respondents' exercise of undue influence was upon petitioners. *Kaiser v. Pearl,* supra. This proposition of law and the foregoing disposition of petitioners' first point establish the second point has no merit.

The petitioners' third point is that the trial court failed "to recognize the presumption of undue influence successfully raised by the appellants' evidence that required the respondent's rebuttal of such presumption." Without so deciding, it may be assumed the evidence did establish such a presumption of undue influence. However, "the introduction of evidence estab-

lishing the presumption makes a case which must be submitted to the jury. A necessary corollary of this rule would be that, while such evidence would be sufficient to support a verdict finding 'no will,' it would not, however, *compel* a finding for the contestant." Hanna & Borron, 5 Mo. Prac. § 132, supra, (footnotes omitted, emphasis in original). Also see *Estate of Brown v. Fulp,* supra; *Goodnight v. Curry,* 618 S.W.2d 278 (Mo.App.1981). Moreover, contrary to petitioner's assertion, the respondent did introduce evidence to rebut an inference of undue influence. *Cf. Estate of Brown v. Fulp,* supra; *Matter of Estate of Soper,* supra. Petitioner's third point is denied and the judgment is affirmed.

PREWITT, P.J., and FLANIGAN, J., concur.

HOGAN, J., not participating.