Agnes M. DAVIS et al., Respondents,

v.

Ann J. PITTI and Carl C. Pitti, Appellants.

No. 55536.

Supreme Court of Missouri,
Division No. 2.

Nov. 8, 1971.

R. Forder Buckley and Albrecht & Homire, James L. Homire, Jr., St. Louis, for respondents.

James C. Jennings and Milton R. Fox, St. Louis, for appellants.

HENRY I. EAGER, Special Commissioner.

This is an action by three sisters against another sister and her husband to cancel a deed from their father. The deed was a quit-claim of a four-family apartment building in St. Louis to the defendant sister and the father as joint tenants; the father died thirteen days after the deed was executed. The grounds alleged and relied on at the trial were mental incapacity and undue influence; others were alleged and abandoned. The trial court cancelled the deed on the ground of undue influence and defendants appealed.

The grantor, Joseph Stallone, was an Italian; he could not read or write, and spoke English brokenly. He had lived in St. Louis many years; he was 74 years of age when he died. He was married three times; his first wife, the mother of all four daughters, died many years ago; he then married one Mary Masters, but that union ended in divorce. He finally married "Helen" (surname not shown) perhaps eight years before trial; she died on May 14, 1969. Joseph apparently did not live with any of his children until the year 1969. The defendant Ann Pitti left the home when she was about 19; the other girls stayed longer, and Agnes, the youngest, stayed at home until she married about 1949. In the meantime, she had been working for 10 years and either turned her paycheck over to her father (an Italian custom apparently) or, as in later years, paid board. For 20 years thereafter she saw him two or three times a week. There is considerable evidence to indicate that Joseph regarded and treated Agnes as his favorite daughter until very shortly before his death. He had on many occasions referred to Ann as a "devil." Joseph owned certain pieces of real property, from time to time, and his income seems to have come from these, at least during his later years. Difficulties developed between Ann and the other three daughters, and this state had persisted for many years. It is also indicated that Joseph did not visit Ann often through the years after her marriage. Joseph had been shot during prohibition days (otherwise unexplained) and had walked with a limp ever since.

On March 5, 1969, Joseph became very ill at his home and was found on the floor

with his eyes "glassy"; he was taken to a hospital (Christian Church Northwest) by Agnes, her husband and the other two plaintiffs. He was in a "near coma state," confused, and with a weakness on his left side resulting from a stroke, "fairly severe"; he did not improve promptly, and developed a gangrenous gallbladder, which was removed; he continued to be confused much of the time and had hallucinations at other times; he continually tried to get out of bed; his condition was complicated by advanced diabetes. Agnes saw him once or twice a day; Antoinette saw him substantially every day. He was taken from the hospital on April 5 by the defendants (who had visited him in the hospital) without the knowledge of the other sisters; it seems, however, that the hospital permitted his discharge. Defendants took him to their home, where he stayed for a week and then went to his own home on College Avenue, although his wife had been in bad physical condition for a year or more. Agnes saw him there several times and Mary twice; Ann Pitti seems to have spent much time there. Mr. Pitti took him to his physician, Dr. Headrick, four times from April 12 to June 23; on April 26 he had been crying and was "disturbed" and his blood pressure was up; on June 23 he complained of "weakness," a continuation of the stroke. He had been given regular medication. There had been considerable friction between Joseph and Helen during their marriage and some of the difficulty arose about a sale and division of the proceeds of the piece of property involved here, possibly in view of a divorce.

Joseph's wife Helen died on May 14, 1969. He then went, or was immediately taken by the defendants, to their home where he stayed until his final hospitalization. Apparently because of the alienation between plaintiffs and defendants, the three sisters saw little of him there, although Agnes phoned him. The plaintiffs testified that this was to protect him from anticipated arguments, etc. Agnes testified that she and her husband went there the first week but that Pitti started an argument or a threatened fight, and they did not go back.

The title to the property in question here had stood for some time in the names of Agnes and her sister Antoinette, two of the plaintiffs. Their father had deeded it to them; there is no explanation of the reason. At some time in May 1969 or earlier, and before Helen's death, Mr. Heberer, a real estate broker, had been consulted through a salesman and asked to prepare a quitclaim deed to that property from the two sisters to Joseph with the apparent object of selling the property. The contact seems to have come from Joseph and Helen, but after she died Mr. Pitti told the broker that he should go ahead with the preparation of the deed, although the broker had assumed that the matter would be abandoned. He got the necessary information and he did in time prepare the deed. *Someone* arranged for a meeting at the home of Agnes and her husband on the evening of May 21; Mr. Pitti had called the real estate man and arranged that he should pick up Joseph and take him there; all three sisters were there and at least one husband. This date was only one week after the death of the wife Helen. Joseph stated, and insisted, that he wanted this property in his own name; he did mention a trip to Italy. He apparently gave no further reason. One or more of the girls doubted the soundness of the move and suggested that he might put it in a "trust fund to protect himself." His only answer was that he wanted it in his own name, and the two daughters signed the deed. There was some indication that he was incensed at "things" that had been "told to him"; Agnes asked "What did I do to you?" and he said, "Nothing." She testified that Joseph had "changed" overnight.

In June, Joseph sold the College Avenue property (his home); a real estate agent brought him a contract for $14,000, but he said that he wanted $14,500. The contract was redrawn, the sale completed, and he

received a check for $13,479.51. Mr. Pitti had told the agent that Joseph could not come to the office for closing, so all negotiations were in the Pitti home. The Pittis were presumably present. On June 11, Mr. Pitti took Joseph to the Northside Bank where he withdrew $1,813.72, closing his account; that money was deposited in the Pittis' checking account. On June 25, Pitti took him to the Northland Bank where a joint account (Joseph and both Pittis) was opened and the proceeds of the College Avenue property were deposited in that account, either then or a day or two later. The Pittis admittedly did the "talking" in connection with these bank accounts, supposedly because of Joseph's difficulty in speaking. On July 8 the Pittis transferred all funds from that joint account to one in their own (two) names. This was while Joseph was in the hospital and desperately ill, as related later. One hundred dollars was received by Joseph for the sale of his furniture, $190 in rents, and two social security checks. The disposition of these funds is not shown. Pitti testified that he paid out $2,611.11 for nursing services. The Pittis declined to pay the funeral expenses but, after some argument, apparently paid one-fourth. They kept Joseph's 1959 Ford car.

About the middle of June, 1969, Mr. Pitti called a real estate broker, James R. Rosenthal, and asked him if he could prepare a quitclaim deed; he was told, of course, that the names and description would be needed. These were furnished by Pitti and a quitclaim deed to the apartment property here in question was prepared. Pitti testified that he took Joseph to the office on one occasion in connection with this request. The deed purported to convey the property to Joseph and his daughter Ann as joint tenants. Pitti picked up the deed about a week before July 2. A little later, and still before July 2, Pitti called and asked Rosenthal if he could come to their house for the execution of the deed, saying that Joseph was sick. Rosenthal did not go, so Pitti called on July 2 and asked Rosenthal if he would be at his office that evening. An appointment was made for 5:00–5:15 p.m. At that time both Mr. and Mrs. Pitti appeared in their car and parked in front of the real estate office, with the deed. Joseph was in the back seat with Mrs. Pitti, where he remained throughout the procedure. Rosenthal came out to the car and greeted them; he testified that he asked Joseph if he was "signing this deed of your own free will," and that Joseph nodded; he, Joseph, talked some with Ann in broken English, or a mixture of English and Italian, which Rosenthal did not understand; Rosenthal handed Joseph a clipboard, the deed was placed on it, and Joseph signed it. Rosenthal then took his acknowledgment and kept the deed for recording, saying that it would probably take about two weeks to get it back. [We note here, parenthetically, that the deed was not filed for record until July 15, at 3:29 p.m., after the death of Joseph.] Rosenthal testified that he observed no indication of "force or coercion"; he did not understand what was said between the parties. From that place, Joseph was taken to McDonald's, where it is said he ate hamburgers, and then to the hospital for his last stay.

On the morning of July 2 at about 10:00 o'clock (the date of execution of the deed) Joseph told Ann that his legs were weaker and that he wanted to go to the hospital immediately, or "right now." Ann called her husband, the husband tried to call their (the Pittis') doctor but could not get him, talked to his wife, and the net result was that nothing was done until evening when Pitti came home from work. At that time the combination trip concerning the deed, the hamburgers and the hospital was begun. Joseph was admitted to Christian Hospital, St. Louis; Ann testified that he walked in, with help. The hospital record showed the following upon admission: "He has difficulty of speech and unable to walk. He had a CVA several weeks ago * * * became progressively worse and unable to care for himself. * * *

known diabetic * * * history of hypertension of many years duration. I Berwald M.D." Further records show a progressive deterioration, uncontrollable diabetes, and death on July 15. An additional record of 7–2–60, apparently of the emergency room, was as follows: "Injured name: Stallone, Joe * * * Age 74 * * * Where did injury occur: Home. How did injury occur: Unable to walk without help. Difficulty with speech." That part of the record also recited that he arrived by wheelchair, with help, that he had "weakening in legs, especially left. Couldn't walk, and difficulty of talking past two weeks." Dr. Berwald explained that there was no "injury" in the ordinary sense but rather an "event." During this stay in the hospital defendant Ann was with him almost constantly. The other sisters were not notified until three or four days after he entered the hospital. Agnes testified that when she saw him in the hospital he said "Oh, Aggie I've been crying for you" and that he tried desperately to talk more; also that Ann would not leave the room. Mrs. Pitti had called Dr. Irvin Berwald for the last hospital treatment, rather than his previous doctor; Dr. Berwald was her physician. Joseph was "stuperous" most of the time during this hospitalization and in a coma towards the end, according to Dr. Berwald.

There was much evidence, pro and con, of mental capacity, and incapacity. It is impossible to relate it all. The defendants' witnesses testified in effect that his mind was substantially normal and that he understood business affairs up to and including the time of the execution of the deed and perhaps during the early part of the hospitalization. The defendants testified specifically that he understood and knew what he was doing at the time of the execution of the deed, but that he always relied on others to tell him the contents of papers or documents. It is clear that Joseph was much confused, to say the least, during both of his hospitalizations. He had suffered several strokes. Antoinette

testified that during April (in between the two) on College Avenue he did not know her and was still confused; Charles Davis (husband of Agnes) testified that in May Joseph had "lost many of his faculties"; a registered nurse testified that on five visits during April and May he was depressed and that he "just gave up"; a licensed practical nurse saw him (on her own business) on College Avenue about May 1, and testified that he was "very vague" and couldn't remember much. Dr. Headrick testified that when he last saw him on June 23 there had been no recent improvement and that he did not have "sufficient insight" to plan his affairs. On cross-examination he said that if he had "negotiated" real estate deals that might change his opinion, i. e., "If I knew he had * * *." Dr. Berwald testified that he knew his children and had the faculties to decide what he wanted to do. Little is shown of his conduct and condition while he stayed with the defendants from May 14–July 2.

Mrs. Pitti testified: that the transfer of the property was Joseph's own idea and that she never suggested it; also, that he said that he had "disowned" his other three daughters; that the only "trouble" with him on July 2 was that his legs were weak and that he had had a "light stroke," but that his mind was all right; that she was not "active in arranging the transfer"; that her husband did call Rosenthal on July 2 to make the appointment. Mr. Pitti testified that Joseph was in full possession of his faculties when he executed the deed, that through the years he had a mind of his own, but that he relied on Ann to tell him about this deed because he could not read. It has been impossible to relate all the details of this controversy, but we have considered the entire (and voluminous) record.

The points and authorities in appellants' brief are really insufficiently definite to comply with our rule; however, in this equity case where the only real question is the sufficiency of the evidence to sustain

the trial court's judgment, we shall proceed to the merits.

In a memorandum opinion citing various cases the trial court held that Joseph's mental capacity was not so impaired as to invalidate a gift to his daughter, since that requires less mental capacity than an arms-length transaction; but also that his mental and physical weakness was a factor to be taken into account on the issue of undue influence. After reviewing the evidence at some length, the Court further held that a fiduciary relation existed between the Pittis and Joseph, that it was incumbent upon them to show that undue influence had not caused the execution of the deed, and that they had failed to do so; accordingly, cancellation was decreed. We have determined to affirm.

■■■ Sundry cases are cited concerning the principles applicable in actions to cancel deeds. They are so well known that we need not discuss any of the cases. The evidence must be "clear, cogent and convincing" to support a cancellation and the appellate court must review the evidence and reach its own conclusions, but due deference should be given to the findings of the trial court on matters involving oral evidence. We agree with the trial court that the showing of mental incapacity here was not sufficient, in itself, to invalidate a deed of gift to one's daughter, where it is only required that the grantor shall know the extent of his property, his relatives, and their respective claims upon him. Cruwell v. Vaughn, Mo., 353 S.W.2d 616; Walton v. Van Camp, Mo., 283 S.W.2d 493. But Joseph's mental and physical conditions, which we shall refer to further, were highly material upon a consideration of the issue of undue influence. Holland v. Anderson, Mo., 196 S.W.2d 175; Houghton v. West, Mo., 305 S.W.2d 407; Steller v. Steller, Mo., 401 S.W.2d 473. The mere lack of consideration in a deed from parent to child does not per se invalidate the deed but it is an element to be considered.

■■ We hold, first, that there was a confidential relationship between Joseph and both of the Pittis. They had assumed complete custody of him (except for one month) from the time he left the first hospital on April 5, and there is a fair inference that they discouraged the plaintiffs from visiting him; at least, things were made so unpleasant that they seldom did so. They were related to him. They (and we mean one or both) took some part in the preparation and procuring from the real estate broker of the quitclaim deed which two of the plaintiffs executed at Joseph's insistence, just one week after his wife's death; they took him to Rosenthal to arrange for the preparation of the deed now in question and directly procured the execution of that deed; they took complete charge of his bank account and money, merely taking him to the banks with them; they read and explained all papers to him; they were presumably present when he arranged the sale of his College Avenue home and when he received the proceeds; he was living in their home. He acted alone upon the occasion when he insisted that Agnes and Antoinette deed the apartment property back to him, but we do not know what caused or preceded that action. A confidential relationship exists when one relies upon and trusts another in regard to the handling of property and business affairs, thus creating some fiduciary obligation. Flynn v. Union National Bank of Springfield, Mo.App., 378 S.W.2d 1, 11; Walton v. Van Camp, Mo., 283 S.W.2d 493, 501; Wilhoit v. Fite, Mo., 341 S.W.2d 806, 813.

■ The sole issue remaining in this case is that of undue influence; it is defined as that influence which, by force, coercion or overpersuasion destroys the free agency of the grantor to act. Houghton v. West, Mo., 305 S.W.2d 407; Wilhoit v. Fite, Mo., 341 S.W.2d 806.

■ Undue influence need not be shown by direct testimony but may, and usually is, inferred from all the facts and circum-

stances, and it is usually concealed. Wilhoit v. Fite, supra; Houghton v. West, supra; Steller v. Steller, Mo., 401 S.W.2d 473. And it is not necessary to show overt acts operating at the very time the instrument was executed. Houghton, supra; Steller, supra. And, as we have already indicated, mental and physical weakness of the grantor is a highly important factor.

Some Missouri cases have held that where a confidential relationship exists and a deed or will is made favoring the one acting in a fiduciary capacity, a presumption of undue influence arises, and that the burden is upon that person to rebut the presumption. In re Patterson's Estate, Mo., 348 S.W.2d 6; Holland v. Anderson, Mo., 196 S.W.2d 175. However, the majority of our cases hold that in addition to the confidential relationship there must be some evidence from which the Court can infer undue influence; if such a presumption arises, the defendant may rebut it; if there is no rebuttal the presumption is conclusive; if there is, the question then becomes one of fact for resolution by the trial court. Flynn v. Union National Bank of Springfield, Mo.App., 378 S.W.2d 1; Walton v. Van Camp, Mo., 283 S.W.2d 493; Mintert v. Gastorf, Mo., 417 S.W.2d 101; Sullivan v. Winer, Mo., 310 S.W.2d 917; Wilkie v. Elmore, Mo., 395 S.W.2d 168.

The trial court here adopted the view that a presumption of undue influence arose from the existence of the fiduciary relationship and held that this was *not* rebutted by the defendants. Therein it necessarily disbelieved the evidence of the defendants themselves in so finding that the presumption had not been rebutted. Had it believed defendants' testimony that Joseph himself suggested the gift and voluntarily executed the deed and transferred the bank account, it could not have so found. We adopt the view that there should be, in addition to a fiduciary relation, some evidence from which undue influence may be inferred. Such evidence here was ample; we defer to the finding of the trial court in its disbelief of the defendants, and also, acting independently, we find accordingly. In discussing the facts we find and hold that the defendants acted in unison; that is the only reasonable conclusion. Hence, we refer to them in the plural.

On issues of this kind no case will be found which is strictly applicable on the facts. In addition to the cases already cited, however, one might note also: Machens v. Machens, Mo., 263 S.W.2d 724; Manahan v. Manahan, Mo., 52 S.W.2d 825; Peine v. Sater, Mo., 289 S.W.2d 101; Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903. These are applicable, at least in principle. We have not attempted to discuss the facts of the cases cited by defendants, athough we have referred to some of them in this opinion. They are not controlling on our facts, and indeed some are cited on mere generalities. We are persuaded particularly by the following facts: that Joseph was in the complete custody of defendants for at least a month and a half before the deed was executed; that his physical condition was extremely bad, and his mental condition was at least much weakened; that one defendant told the real estate man immediately after Helen's death to go ahead with the preparation of the quitclaim deed from the two plaintiffs to Joseph, thus clearing the way for the later transfer, although the real estate man assumed that the matter was to be dropped; that Joseph was never furnished with any independent advice concerning the transfer of any of his property; that the transfers of this and all his other property were wholly inconsistent with his regard throughout the years for his other daughters and particularly for Agnes; that as Agnes testified, he "changed overnight"; that defendants delayed his request on July 2 for an immediate entry into the hospital for about nine hours and until *after* he had executed the deed; that defendants had been active in having Rosenthal prepare the deed, although Joseph was taken to his office once; that there was no considera-

tion for the deed; that defendants had paid little attention to Joseph through the years until March, 1969; that defendants discouraged the plaintiffs, directly or indirectly, from visiting him at their home; that defendants took over Joseph's bank account (including all the proceeds of his College Avenue property) by means of a joint account, did all the talking at the bank concerning it, and merely took him along; that they later (while he was in the hospital and substantially comatose) transferred the money to a joint account in their own (2) names; that they apparently kept such other incidental money and property as he had, paying only the nurses and one-fourth of the funeral bill; that the deed here in question was not recorded until *after* Joseph died, but on the same date, at 3:29 p. m., with no explanation for the delay; in fact, the testimony of the real estate man who took the acknowledgment that he said it would take about ten days *to get the deed back* after filing it, is misleading, for the delay was in the *filing*; we infer, reasonably, that this delay was intentional; that plaintiffs were not told of the deed until after the death, and that defendants did not even notify plaintiffs that Joseph was in the hospital until three or four days after he entered.

From these and other facts we find and conclude that a presumption of undue influence arose, that it was not rebutted, and we further find and conclude from all the evidence that the deed in question was procured through the undue influence of the defendants and that it was and is void.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.