**Leorin LESH, Appellant,**

v.

**Mary E. LESH, Respondent.**

**No. 50674.**

Missouri Court of Appeals,
Eastern District,
Southern Division.

Aug. 12, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 24, 1986.

Application to Transfer Denied Nov. 18, 1986.

John W. Reid, II, Schnapp, Graham & Reid, Fredericktown, for appellant.

Eric C. Harris, Mayhugh & Harris, Flat River, for respondent.

CRIST, Judge.

Plaintiff Leorin Lesh (son) appeals the decision of the court holding he failed to prove the disposition of the personal property owned by his father, Orin Lesh (decedent), was procured by the undue influence of Mary Lesh (Mary). We affirm.

The evidence produced tended to show the son was the illegitimate offspring of decedent. It appears the son was never formally acknowledged as such by decedent, and his relationship with decedent was virtually nonexistent preceding the death of decedent's wife due to her disapproval. Following her death, the relationship improved and became closer.

Mary was decedent's sister-in-law, and she was married to decedent's brother John. She had previously been married three times, twice to decedent's brother Fred, and once to a person who appears not to be related to the Leshes. Mary and (especially) her husband John were responsible for the *rapprochement* of decedent and son following the death of decedent's wife.

Decedent and his wife were very frugal and accumulated a large sum of money and a farm. The money was largely held in certificates of deposit with local financial institutions. Decedent's wife, prior to her death, took care of most of the banking. Following her death, Mary began to act in that capacity, taking care of much of decedent's banking for him. She also began to care for decedent in other ways as well, checking on him every few days either in person or by telephone, cooking and cleaning for him, and arranging appointments with doctors and, where needed, hospitalizations. Her visits to decedent entailed a very long drive.

In 1980, apparently in response to John Lesh's advice to place some of his money in son's name, decedent, after his wife's death, transferred several certificates of deposit into the names of himself, Mary and his grandchildren (son's children). Other certificates were placed in the names of decedent, Mary and Leorin; several other certificates were placed in the names of decedent and Mary, and one was established in the names of decedent and Mary with a certain church as the beneficiary. Mary was entrusted with the actual physical possession of the certificates, holding them in her safe deposit box. Decedent apparently trusted her implicitly, and therefore trusted her with these instruments. At this time only son and his children were mentioned by decedent as those who would receive his property following his death.

Later in 1980, an account in the name of decedent and Mary was opened in the Leadco Credit Union. Decedent was not eligible to be a member of that credit union in his own right; however, as a relative (the brother-in-law) of Mary who was eligible, he was able to have an account there. Excerpts of Mary's diaries, which contained a fairly detailed recital of Mary's help to decedent, and when and where they were together, were received in evidence. These excerpts at least suggest that John, not decedent, went with Mary to open this account and signed the signature card. The teller, when asked who opened the account, referred to this signature card, which contained a signature purporting to be that of decedent. However, the records of the account reflect several occasions where decedent personally transacted banking business in this account.

Mary retained the passbook to this account, as well as the other certificates of deposit which she kept, at decedent's request, in her safe deposit box until decedent's death in 1984. During that time she

continued to do the lion's share of decedent's banking and looked after him in other ways as well.

Excerpts from her diary, which were read into evidence, indicate she seldom, if ever, referred to son in a positive manner. He was characterized as greedy and lazy, and visits of son and his children to decedent were characterized as "shakedowns." Statements attributed to decedent gradually began to agree with this assessment, i.e., "[decedent] said he had given Leorin all he was going to get, that he would just blow it. He isn't at all happy with Leorin because he lies and won't work. Said he didn't think Fanny [son's wife] was any better, just slicker. Sounds like he has their number."

Decedent decided in 1983 to sell his farm. Mary was very much in favor of this sale; she wrote "hallelujah a dozen times over" in her diary upon learning of the sale. The proceeds of the sale were deposited in the Leadco Credit Union Account. Decedent then purchased a mobile home, titled in the names of decedent and Mary, who continued to care for decedent as she had prior to the sale. There was testimony Mary was the only person in favor of the sale, and that decedent was not happy with his life after he left the farm.

Events continued in this manner until decedent's death in 1984. A few days previous to this death, at a July 4 picnic at the home of one of Mary's sisters, decedent is alleged to have told one of Mary's brothers-in-law he was going to give half of his money to Mary and the other half to son and his children. Son countered with his wife's testimony decedent had stated Mary was to get $20,000 for her help and services and son and his children were to get the remainder.

Shortly following decedent's death, Mary and son met and divided dividend checks which had been received after the death, matching the checks to the appropriate certificates so that the proper person would get the dividend. Mary also delivered to son the certificates of deposit held jointly between herself, decedent and any member

of Leorin's family. The delivered certificates totaled approximately $127,000. She also signed over the title to the mobile home to son, because she did not want the hassle of dealing with this particular piece of property. She also delivered a trust account valued at $10,000 to a church which had been named as the beneficiary of that account. She retained the remainder of decedent's assets which totaled approximately $135,000.

A few days later son called Mary and inquired about the Leadco account which contained approximately $75,000. The son alleged she asked how he knew about that account; his reply was that decedent had informed him of it. Mary claimed it as hers and alleged son stated that was too much for her. Mary claimed this conversation was the first time she heard son's allegation she was to receive $20,000 for her services and son was to get the remainder of decedent's assets. Mary refused to divide the Leadco account in any way and this litigation thereafter ensued.

Son petitioned for an accounting on a theory of violation of an express trust. The case was tried on the theory Mary had exerted undue influence and procured this disposition of decedent's property. Relief was denied as the trial court found no such undue influence had been shown. Son appeals.

■■■ Both of son's points proffered upon appeal assert error in the court's ruling son did not show undue influence was exerted upon decedent by Mary. He claims that ruling was not supported by substantial evidence. We view the evidence in the light most favorable to the judgment, *Perkins v. Rantz*, 631 S.W.2d 907, 911[4] (Mo. App.1982), deferring to the trial court's determination of credibility. *Daniels v. Champion*, 592 S.W.2d 869, 869 (Mo.App. 1979). Son had the burden of proof to show undue influence by clear, cogent and convincing evidence. *Perkins*, 631 S.W.2d at 911[3]; *Daniels*, 592 S.W.2d at 869.

■■■ Son's first point on appeal challenges the court's determination the joint

tenancy in the Leadco Credit Union Account vested the full interest in the account in Mary upon decedent's death, claiming fraud or undue influence vitiated the existence of a joint tenancy. Fraud is alleged in that decedent was claimed not to have been present when the account was opened and not to have signed the signature card. It is alleged Mary's husband John signed the card. This allegation of fraud was not pled with specificity, and indeed was not overtly made at the trial court level. *See* Rule 55.15. Therefore, this court would be justified in ignoring this contention. However, the evidence concerning who was present at the credit union was far from conclusive or uncontroverted. Also, it appears decedent personally conducted transactions at Leadco utilizing this account, thereby consenting to the arrangement. Therefore the court did not err in ruling that joint tenancy was not fraudulently created.

▉ Likewise, son did not prove undue influence. Undue influence is defined as "influence which, by force, coercion or overpersuasion destroys the free agency of the grantor." *Perkins*, 631 S.W.2d at 911[5]. A presumption of undue influence arises when the evidence establishes the existence of a confidential relationship between the grantor of the property in question and its recipient, and, in addition, there is some other evidence offered from which undue influence may be inferred. *Obermoeller v. Speck*, 544 S.W.2d 21, 23[2] (Mo.App.1976). A confidential relationship is established when one reposes trust and confidence in another in the handling of certain business affairs. *Davis v. Pitti*, 472 S.W.2d 382, 387[5] (Mo.1971). The establishment of the presumption of undue influence creates a factual issue for the court to determine. *In re Estate of Soper*, 598 S.W.2d 528, 538 (Mo.App.1980).

▉ There is no doubt there was a confidential relationship between Mary and decedent. Entries from Mary's diary which were read into evidence establish Mary was the only person trusted by decedent. She did the bulk of his banking, depositing and cashing checks. She was named as a co-owner on his Certificates of Deposit, which were held in her safe deposit box along with passbooks from other accounts, to which she had access. She did much of his shopping. She helped with his taxes. In addition, she tended to his medical needs, and arranged hospitalizations and doctors' appointments when necessary. It appears that there was definitely a confidential relationship established in this case. *See Davis*, 472 S.W.2d at 387.

▉ However, even in the presence of a confidential relationship and a disposition of property which apparently favors the confidant, there must be evidence of the actual exercise of undue influence, an exercise which destroyed the free agency of the decedent, to create the presumption. *Obermoeller*, 544 S.W.2d at 23[2]. Substantial evidence is required beyond mere suspicion or the opportunity to exercise undue influence. *Maurath v. Sickles*, 586 S.W.2d 723, 731[11] (Mo.App.1979). Such evidence is often circumstantial. *Davis*, 472 S.W.2d at 387[7].

In this case, the decision of the court, son had not shown, by clear, cogent and convincing evidence, Mary had exerted undue influence upon decedent, is supported by substantial evidence. Decedent does not appear to have been susceptible to the exercise of undue influence. The record indicates he could be characterized as fiercely independent, and was best described as "ornery." He does not appear to have been incompetent or weak mentally. Despite the depredations of age, he appears to have been physically active and mentally alert. Decedent did not obtain independent legal advice concerning any of these transactions, which was apparently due to his distrust of attorneys. However, it is quite clear he understood the effect of holding deposits in joint tenancy, and the rights of the joint tenant to take the funds during his lifetime and after his death; and he apparently intended to use his joint tenancy accounts as a substitute for a will.

▉ Finally, while it is significant decedent "favored" his sister-in-law "over"

his son, this fact is not conclusive. Decedent had not really known his son until approximately the four years following his wife's death, while he had known his sister-in-law (who shortly after decedent's death divorced his brother) for over forty years. The property involved belonged to decedent, and it was his decision as to its disposal. Without some evidence indicating the presence of undue influence, a court will not interfere with the chosen disposition of this property. *Mangan v. Mangan*, 554 S.W.2d 418, 421[8] (Mo.App.1977). Therefore, no presumption of undue influence arose for Mary to rebut.

Son's other point relied on alleges error in the failure of the court to find Mary violated a trust relationship by failing to deliver the bulk of the assets received from decedent, keeping only the $20,000 she was entitled to retain as recompense for her services. He further alleges if decedent had decided to split his assets, one-half to son and one-half to Mary as Mary claimed, such change in the decedent's disposition of his assets had been procured by the exercise of undue influence. As to the latter allegation, we have already ruled there was no exercise of undue influence by Mary in this case, and therefore the second portion of the assignment of error is moot.

 Son and his wife testified the certificates of deposit were placed in Mary's name as a trustee of an oral trust, the terms of which obligated her to turn over the assets in excess of $20,000 to son. Mary, allegedly, was to retain that $20,000. To establish an oral trust, the words and actions by the putative settlor must convince the court completely and fully of the creation of the trust. *Gardner v. Bernard*, 401 S.W.2d 415, 423[18] (Mo.1966). The evidence in this matter was conflicting, with Mary producing testimony showing decedent contemplated an approximately equal division of the property; and therefore, we find the court's decision was supported by substantial evidence. *See Daniels*, 592 S.W.2d at 869.

The judgment is affirmed.

REINHARD, P.J., and GARY M. GAERTNER, J., concur.