Helen Carroll HAWKINS, et al., Appellants,

v.

Dale Lee ALLISON, et al., Respondents.

No. 15584.

Missouri Court of Appeals, Southern District, Division One.

Feb. 6, 1989.

Morran D. Harris, Osceola, for appellants.

George D. Nichols, Lamar, for respondent, Linda Allison.

Donald B. Russell, Nevada, for respondent, Dale Lee Allison.

CROW, Presiding Judge.

This is an appeal by the plaintiffs from a judgment adverse to them in a proceeding to discover assets in the estate of Archie L. Carroll, deceased. At issue are a bank account and three certificates of deposit.

Mr. Carroll ("Archie") executed his last will and testament May 9, 1978, naming his wife, Dortha, executrix and devising and bequeathing his entire estate to her if she survived him. The will provided that if she predeceased him the estate was to be divided equally between his nieces and nephews who were living as of the date of his death, and the will named Dale Lee Allison ("Dale") as substitute executor.

Dortha died July 5, 1980, survived by Archie. At the time she died there was a checking account, number 15–368–0, in Tri–County State Bank of El Dorado Springs ("Tri–County") in the names of Archie and Dortha as joint tenants with right of survivorship.

Leola Bland, an employee of Tri–County, testified that on July 22, 1980, Archie came to the bank and told her he wanted Linda Allison put on the card for account number 15–368–0. Ms. Bland testified:

"And it is legal procedure to explain to him at the time, anyone, adding a name if they want it to be just where they can write checks or if they want right of survivorship; and which it states on the back of this card right of survivorship, which I told him. I read and explained to him that's what this was. He said that's the way he wanted it, right of survivorship, so that is why that is on the back."

Linda Allison ("Linda") is the wife of Dale, having married him November 22, 1976. At time of trial [1] Linda had been employed at Tri–County 25 years, being appointed cashier and secretary of the board in 1984 and elevated to director in 1986. Dale, as best we can deduce from the record, was unrelated by blood to Archie, but was a nephew of Dortha.[2]

Leola Bland was asked whether Linda was with Archie on July 22, 1980, when Archie asked that Linda's name be put on account number 15–368–0. Ms. Bland replied:

"We had her to come back to bookkeeping, which is general procedure, me being supervisor of bookkeeping at the time, I would have called her."

Ms. Bland recalled no conversation between Linda and Archie about the account.

1. Trial began September 10, 1987.

2. Dale, in his testimony, identified Dortha as his aunt. In his application for letters testamentary Dale did not list himself as a nephew of Archie.

Asked about Archie's "mental condition or mental state" at the time, Ms. Bland answered:

"He was very alert at that time when he—when I was reading the card and discussing with him about the joint of survivorship."

Archie and Linda subscribed their respective names to a signature card changing the ownership of account number 15–368–0 to themselves as joint tenants with right of survivorship. Archie was 83 years of age at this time.[3]

On October 2, 1980, Archie came to Tri-County and conferred with Ronald M. Sewell, president of Tri–County, about a "money market certificate." At Archie's direction Sewell issued certificate number 11197 for $40,000 in the names of Archie or Linda as joint tenants with right of survivorship, to mature in 30 months. Sewell's testimony included this:

"Q. Did Linda Allison, in any manner, participate in the issuance of that certificate?

A. No.

Q. Did you observe Linda Allison discussing or talking with Archie Carroll at or prior to the time that certificate was issued?

A. No.

. . . .

Q. Did you discuss with Linda Allison the issuance of this certificate?

A. Not at all.

. . . .

Q. In your judgment did [Archie] understand absolutely the significance of this transaction?

A. No doubt about it. That's why it was set up that way, so it would not be included in the—in his will.

Q. His mental condition was good at that time?

A. Absolutely.

Q. No question about it in your mind?

A. None—None whatsoever.

Q. Was he what one would call an independent, strong-willed individual, if you know?

A. Yes."

On January 9, 1981, Archie came to Tri–County and told Ms. Bland he "wanted to draw interest" on account number 15–368–0. Ms. Bland testified:

"[A]gain, we explained did he want it left joint of survivorship with he and Linda Allison, and again, he wanted it joint of survivorship."

Asked whether Linda was with Archie on this occasion, Ms. Bland replied:

"No, I'm sure she wouldn't have been because he would have come back and said he wanted to draw interest on his banking account; and we, again, would have had to call for her, because, see, when they come back to make an interest-bearing account, we have to have a new signature card. . . ."

Archie and Linda subscribed their respective names to a signature card changing account number 15–368–0 to "an interest-bearing NOW account" in the names "A.L. Carroll or Linda Allison" as joint tenants with right of survivorship. Ms. Bland's testimony included this:

"Q. Ms. Bland, at all times during the period of time that these transactions occurred that you testified that you handled, what was Archie Carroll's mental condition and health?

A. Well, anything that I transacted with him on the signature cards there was no problem with his mental condition.

Q. He fully understood the import of his acts; is that correct?

A. Why I'm sure he did because being—having it read to him."

On April 2, 1983, some 27 months after the transaction of January 9, 1981, Archie came to Tri–County to renew certificate number 11197. Carol Reed, a Tri–County employee, asked Archie if he wanted the new certificate titled the same way. Asked how he responded, Ms. Reed testified: "He said just issue it as it was prior."

Ms. Reed issued money market certificate number 15217 dated April 2, 1983, in

---

**3.** A document received in evidence showed Archie was born February 12, 1897.

the names "Archie L. Carroll or Linda Allison" payable to either or survivor. The amount of the certificate was $41,736.43, which included interest. Ms. Reed handed the certificate to Archie and he left the bank. Asked whether Archie talked with Linda as he departed, Ms. Reed replied: "No, not to my knowledge. No."

On August 15, 1983, Archie, who had resided alone in his home since Dortha's death, was admitted to Community Care Center in El Dorado Springs as a resident. He made his own arrangements for this and signed all his admission records. At that time he had a sister who was a resident at the same facility.

Kay Harper, administrator of the facility, testified that when Archie was admitted he was "pretty much self-care to a certain extent." She added, "He needed observation on his dressing and with food, being fed and that type of care."

Judith Russell, a registered nurse and director of nurses at Community Care Center, recounted that the main thing that brought Archie to the Center was malnutrition. She explained:

"He wasn't eating properly on his own. I don't know how much prior to admission that his wife had died, but he still cried a lot about her and was not eating."

Archie was examined by a doctor upon admission to Community Care Center. Asked about the results of that examination, Ms. Russell testified:

"He had cancer of the prostrate [sic] prior to admission. He had eye disorders, glaucoma. He had congestive heart failure, acute chronic prostrate [sic], chronic cystitis, glaucoma with cataracts, he had kidney failure; as the time went on that was added to his diagnosis."

On October 11, 1983, Archie was transferred to Cedar County Memorial Hospital for observation. He was returned to Community Care Center three days later. Asked about his condition on that occasion Ms. Russell responded:

"[I]t was acute prostatitis and ... chronic cystitis, organic brain syndrome, glaucoma, and cataracts.

Q. Okay. What does organic brain syndrome mean?

A. It's what we used to call hardening of the arteries. It's kind of a catchall for anyone that gets old and a little forgetful. Now, they're calling it Alzheimer's....

Q. Now, the fact that he had that, ... you just called it brain syndrome, did that prevent him from looking after himself or his affairs at that time?

A. No, sir.

Q. And did he, in fact, see after himself at that point in time?

A. Yes."

On January 9, 1984, Archie was again hospitalized, this time because of a fractured hip. He had surgery to repair it and was returned to Community Care Center January 20, 1984. Regarding Archie's condition at that time, Ms. Russell's testimony included this:

"Q. ... What did [Archie's physician] diagnose as primary diagnosis and secondary?

A. Parkinson's.

Q. And what's secondary?

A. Prostrate [sic], adenocarcinoma, senile dementia[,] current hip trauma, and glaucoma.

Q. What is senile dementia?

A. It's a condition of elderly people.

Q. Well—

A. Same as organic brain syndrome. I mean they use them interchangeably. I'm quite sure if you got a medical book out there would be a difference in them, but they kind of use them interchangeably and now they've added Alzheimer's disease."

Ms. Russell recalled that in July, 1984, Archie had "a period of confusion." One doctor called it paranoia. The physician prescribed one milligram of Haldol twice a day. Ms. Russell described Haldol as a "psychotropic drug." According to Ms. Russell, Archie had an excellent response to the medication. She added:

"We had it as PRN then after it was stopped twice a day. We just kept it PRN and he used it very infrequently, two to three times a month. When he would get in a period of confusion, we would use it; and it would pull him out of it."

On October 4, 1984, Archie telephoned Tri–County and talked with Brenda Beaty, who worked in "the CD department." Archie requested Ms. Beaty to issue a money market certificate for $16,861.28 in the names "A.L. Carroll or Dale Allison" payable to either or survivor. Ms. Beaty prepared certificate number 17261 per Archie's instructions and, accompanied by Evelyn Esry, another Tri–County employee, took the certificate to Archie at Community Care Center. Archie, who was alone in his room when they arrived, paid for the certificate with a check from one Rosbrough. Ms. Beaty's testimony included this:

"Q. What did his mental health appear to be on that date?

A. Good.

Q. Have any difficulty getting him to endorse the check or to sign the acknowledgement on the withholding exemption?

A. No."

Ms. Beaty left certificate number 17261 with Archie. Asked whether she discussed the issuance of the certificate with Linda or Dale before she went to Community Care Center, Ms. Beaty answered, "No."

The report of Archie's annual physical examination by his attending physician on May 7, 1985, stated:

"Evidence of some confusion, depression, Alzheimer's disease, Parkinson's disease, ASHD congestive heart failure and chronic renal failure."

Ms. Russell was asked what the nurses' notes at Community Care Center showed regarding an incident during the 3:00 to 11:00 p.m., shift on September 27, 1985. She answered:

"Resident completely confused, stripped off all his clothes. Man is normally very modest. Wandering up and down hall without wheelchair or walker. Got into several ladies' rooms causing mass confusion."

Ms. Russell explained that Archie was given Haldol twice that date and it was not repeated until October 2.

On October 5, 1985, Carolyn L. Chism, the "savings supervisor" at Tri–County, received a telephone call from Archie. He said he had some business he wanted to take care of and he wanted her to come to Community Care Center to talk to him about it. Ms. Chism obtained permission for the journey and went there. She testified Archie had two or three checks and that he wanted a money market certificate for $25,000. Then, this:

"Q. And did he tell you how he wanted it issued?

A. Yes.

Q. And what did he tell you?

A. Well, he said he wanted it in his name and Dale Allison's.

Q. Did he tell you he wanted it as joint tenants with right of survivorship?

A. Yes."

Ms. Chism recalled that the total of the checks Archie gave her exceeded $25,000 by some $190. According to Ms. Chism, Archie instructed her to bring the excess back to him in cash. Ms. Chism returned to Tri–County and issued certificate number 18216, dated October 5, 1985, in the names "Archie L. Carroll or Dale L. Allison" for $25,000 payable to either or survivor. She then took the certificate and the excess cash to Archie at Community Care Center. Asked her observation of Archie's mental condition during the transaction, Ms. Chism replied:

"[H]e gave me instructions as to what he wanted done. So, in my opinion, he was sharp enough to know what he was doing.

. . . .

Q. Did you at any time discuss this with Linda Allison that you had issued this certificate with her husband's name on it?

A. Before going out there you mean?

Q. At any time?

A. At any time?

Q. After you came back and typed it up, did you tell her?

A. I think I did mention it to her, after it was all done and everything.

Q. Did you do that before you took it back out to Mr. Carroll?

A. No.

Q. Did he count the money that you gave him?

A. Yes.

. . . .

Q. Did he read over or check the certificate?

A. Well, he looked at it.

Q. Ask you any questions about it?

A. No, not that I remember. Huh-uh.

Q. And you don't recall him being confused at all on that date?

A. No."

A "monthly summary" dated October 12, 1985, in the records of Community Care Center read:

"[Archie] can ambulate in room due to being unsteady of feet, he travels by way of wheelchair. He also uses walker in his room when he gets shaky. He maneuvers wheelchair without peddles on his own to dining room for meals. He feeds himself a low nonsodium diet, he eats from 75 percent to 100 percent of meals. He has lost 2½ pounds this month. His weight goes up and down. Does own personal cares most of the time. He does have to have all cares done for him when he has a period of confusion. He has to be assisted with all cares and dressing when he is really unsteady on feet. Weight is monitored each month, blood pressure each week, pulse taken QUOD, given Lanoxin 0.125 milligram. Pulse has been over 50. Seldom attends nursing home activities, prefers to be by himself. Eyedrops are given BID for glaucoma. Eyesight fair with glasses.... Voice clear, hearing adequate. Resident has been confused approximately 50 percent of the time this month. He usually looks neat and clean. He has difficulty with buttons and zippers. Uses bathroom, ad lib, washes face and hands at sink each a.m. and combs his hair. Has weekly baths and shampoos. Has hair cut at barber shop. Overall plan of care is for resident to remain maximum independence as possible."

Ms. Russell was asked about the segment of the above entry stating Archie had been confused approximately 50 per cent of the time. She explained the notation had been made by "a former LPN employee that worked the night shift, eleven to seven." Ms. Russell continued:

"My feeling on that was that maybe he was at night more so than in the daytime, but he was never confused that much in the daytime. Most of your elderly, at night when it's dark, get more confused than they do in the daytime.

Q. But he was never that way in the daytime to your knowledge?

A. Not 50 percent of the time. No, sir.

Q. Were you on duty what, five days a week?

A. Yes.

Q. And did you see him every day that you were on duty?

A. Yes."

Ms. Russell recalled Archie watched the 1985 World Series on television. She testified: "They brought him a color TV for that and he knew who was playing, you know, and he—he was well aware of his surroundings."

Records of Community Care Center pertaining to Archie showed the following:

June 14, 1986. "Has periods of forgetfulness, confusion, and argumentative behavior. Has PIN med. ordered for periods of argument and combative times."

July 12, 1986. "[R]esident confused at times, but able to do some of his ADL's[.] Feeds self regular low salt diet, eats 75 to 100 percent of diet, watches TV and has several visitors."

July 17, 1986. "[B]ecomes confused and restless at times and disoriented to time and place. Is somewhat hard of hearing, eyesight with glasses, speech adequate."

August 17, 1986. 3:00 a.m. "Resident was very restless and upset this shift. He seen—Kept seeing his mules and cows, gave Haldol, 2 milligram at 12:45, but no calming at all noted. Still very upset this a.m." Same date, 2:00 p.m. "[H]as been very confused today. Has voiced complaint the water's—of the water being deep in his room where the creek came out and has been worrying about the people who are in his room. Made several trips to desk to have the people removed. Was given Haldol, 2 milligrams this a.m. with good result for a period of time. Then confusion returned. Did leave water running in sink and flooded his room this afternoon. Many cards and letters had to be disposed of because they were wet." Same date, 9:30 p.m. "[R]esident has been highly confused, talking about inappropriate things with realty. Has been seeing images, was found sitting crookedly on toilet stool with head leaning against wall. Has black and blue mark with skin scrape on top of left hip. Had indentations and ... red marks on left knee from whichever his knee was against it. Helped to bed and had PJ's put on him. Has been restless, confused and cannot be reached with verbal communication for reasoning. Has been talking and hollering nonstop. Has had bed rails up and bed restraints in place since 9:30 to prevent falling or climbing out of rails. Resident's nephew and wife, Mr. and Mrs. Allison, here at supper time to see resident."

August 18, 1986, 12:00 a.m. "Resident continues to hallucinate, trying to grab things in the air, calling to his mules and so forth. Blood pressure 110 over 80." Same date, 6:30 a.m. "Resident has continued to hallucinate throughout the night and tried to climb out of bed. Bed restraints on and bed rails up throughout the night."

Later that day (August 18, 1986), after being seen by his physician, Archie was transferred to Cedar County Memorial Hospital. He remained there three days, then was returned to Community Care Center.

Dale testified that around this time he was told by Archie's physician that Archie's health was failing rapidly.

At this point in the narrative we turn our attention to account number 15–368–0 which, it will be recalled, had been in the names of Archie or Linda as joint tenants with right of survivorship since July 22, 1980. Linda testified Archie put her name on the account "so I could help him take care of his business and all, and so that if anything happened, why it would be mine." Linda explained that the money in the account came from Archie's social security benefits, rent on property he owned, and payments on a farm he had sold. According to Linda, Archie made all of the deposits in the account until 1983 or 1984, and wrote virtually all of the checks until he entered Community Care Center. After that time Archie would usually have Linda make the deposits. She would take the checks to him and he would endorse them. The account was used to pay Archie's bills, including Community Care Center. Linda recalled Archie wrote the checks to Community Care Center "up through '85," and had a checkbook until he died. Account number 15–368–0 "was in the neighborhood of $60,000" some of the time.

On August 28, 1986, Linda wrote a $25,-000 check against account number 15–368–0 payable to Dale. Dale deposited the check in his and Linda's bank account. Asked what the check was for, Linda answered:

"That was by [Archie's] wishes. He had asked us to take that out a few months before and we just hadn't and that was—he asked us to pay off our home loan."

Dale testified that several months earlier Archie had said to lower the account if he got sick. Then, this:

"Q. Did he tell you specific amounts to write the checks for?

A. No. For one, he wanted us to pay our house off.

Q. What did you tell him at that time?

A. I told him not to worry about it.

Q. Did you ever tell him you wrote that check for $25,000?

A. I told him Linda did.

. . . .

Q. When did you tell him that?

A. Well, it was the next time I went out to see him at the nursing home, and I couldn't tell you the date of it."

On September 2, 1986, Linda paid off the $15,000 balance of a loan on her and Dale's home. The remaining $10,000 from the $25,000 check of August 28, 1986, remained in her and Dale's account.

On September 6, 1986, Linda wrote a $15,000 check against account number 15–368–0 payable to Dale. Dale deposited that check in his and Linda's bank account. Asked what the $15,000 check was for, Linda responded: "That was because [Archie]—at his request, if he—he said if he ever got sick to lower that balance to nothing."

Dale's testimony about the check included this:

"Q. What about the check for $15,000 ... on September the 6th, '86?

A. He knew about it also.

Q. How did he know about it?

A. We told him. We told him.

. . . .

Q. What was his response when you told him you had paid off your home mortgage?

A. He said we was supposed to have done that long before this.

Q. What was his response when you told him you had written—your wife had written you a check for $15,000?

A. He said that's what you was supposed to do.

Q. Was his mine [sic] clear on September the 6th, 1986?

A. I would say so."

On September 16, 1986, Archie entered Cedar County Memorial Hospital. Asked what health problems precipitated that hospitalization, Dale replied, "They said his body was just wore out." Archie died at the hospital three days later.

On September 22, 1986, three days following Archie's death, Linda wrote a $3,397.71 check against account number 15–368–0 payable to Dale. Linda and Dale testified the purpose of that check was to close the account. Linda testified that prior to writing the checks of August 28, September 6 and September 22, she had never paid any of her or Dale's bills out of account number 15–368–0. Dale confirmed this, testifying that prior to those three checks account number 15–368–0 was used for no purpose except to pay Archie's bills.

On October 21, 1986, Dale filed in the Circuit Court of Cedar County, Probate Division, an inventory and appraisement of the property in Archie's estate. The aggregate value was $311,103.61. The inventory did not include account number 15–368–0 nor certificates of deposit number 15217, 17261, or 18216. On February 20, 1987, three nieces and four nephews of Archie commenced the instant action. In their amended petition, on which the cause was tried, the plaintiffs averred that account number 15–368–0 and the three certificates of deposit were created through the undue influence of Dale and Linda, both of whom were in a fiduciary and confidential relationship with Archie. The amended petition averred that said assets were the property of Archie's estate.

The cause was tried by the court without a jury. In its judgment entry the trial court stated, among other things:

"Although a confidential relationship existed between Dale and Linda Allison and the decedent, plaintiffs have failed to prove that the Allisons exerted undue influence upon the decedent Archie L. Carroll."

The trial court held that neither Dale nor Linda possessed any assets of Archie's estate, nor had they wrongfully obtained or disposed of assets of Archie's estate. This appeal followed.

Plaintiffs' brief presents one assignment of error. It reads:

"The court erred in rendering judgment for [Dale and Linda] on the issue of undue influence, because the court erroneously applied the law in ruling that [plaintiffs] failed to prove that the Alli-

sons exerted undue influence upon the decedent, Archie L. Carroll, after finding that a confidential relationship existed between them, and said ruling is against the weight of the evidence, in that said facts may be inferred from the evidence, and [plaintiffs] did present evidence of undue influence sufficient to sustain such an inference, considering decedent's mental condition at the times in question."

The scope of our review in this judge-tried case is established by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

*In re Patterson's Estate*, 348 S.W.2d 6 (Mo.1961), was remarkably similar to the instant case. There one Patterson had a bank account and an account in each of two savings and loan associations. About three months before his death he and a cousin with whom he maintained a confidential relationship executed deposit agreements purporting to change ownership of the three accounts to Patterson and the cousin as joint tenants with right of survivorship. After Patterson's death a dispute arose as to whether the accounts were assets of his estate or belonged to the cousin. The trial court ruled for the cousin. On appeal the Supreme Court of Missouri said:

"We conclude that such interest in the accounts, including that of the right of survivorship, which [the cousin] received by reason of the written deposit agreements was by way of a gift." *Id.* at 10.

The Supreme Court held that when one bestows a gift upon another where the relation of trust or confidence exists it is presumptively void and the burden is upon the donee to rebut this by showing the absolute fairness and validity, including intent, of the gift, and that it is entirely free from the taint of undue influence. *Id.* at 10[5]. The Court found that the written agreements alone were not sufficient to overcome the presumption of invalidity, that they were evidence only that a gift presumably was made. *Id.* at 10. The Court ruled the cousin had failed to sustain her burden of proof, reversed the judgment, and remanded the cause for a new trial. *Id.* at 10[6].

On remand the trial court in *Patterson* heard additional evidence and ruled that it did not overcome the presumption that the gift was invalid as being prompted by undue influence. *In re Patterson's Estate*, 383 S.W.2d 735, 736 (Mo.1964). The trial court added, however, that there was no evidence of any actual fraud, deception, or undue influence on the cousin's part. *Id.* at 739. The trial court further found that the execution of the deposit agreements was done under a mistaken apprehension of their legal effect. *Id.* at 736. On those findings the trial court ruled against the cousin. On appeal the Supreme Court emphasized that the presumption of invalidity was not limited to undue influence; on the contrary the presumption placed on the cousin the burden of showing the absolute fairness of the transaction, the validity of the gift (which would include the issue of intent), and that the gift was free from the taint of undue influence. *Id.* The Supreme Court determined that upon presentation of such evidence the issue of validity became a mixed question of law and fact, with the fact issues to be determined by the trier of fact. *Id.* at 739. The Supreme Court found it unnecessary to decide whether the trial court was correct in ruling that the presumption of invalidity was not overcome. *Id.* The Supreme Court upheld the judgment on the ground that the trial court had correctly found that Patterson and his cousin were mistaken as to the legal effect of the deposit agreements, and that neither intended to create a joint tenancy with right of survivorship in the accounts. *Id.* at 740.

■ In the instant case the trial court, as we have seen, found that a confidential relationship existed between Dale and Linda on the one hand, and Archie on the

other.[4] There is ample evidence to support that finding, and Dale and Linda do not argue otherwise. In addition to the facts already recited there was evidence that Linda was Archie's "errand girl" after Dortha died, that Linda and Dale took Archie wherever he needed to go, that Linda assembled information for Archie's tax returns beginning in 1984, that Archie discussed entering Community Care Center with Linda and Dale before going there, that Dale, at Archie's request, selected a pickup Archie bought in 1978 or 1979, that Archie named Dale as the person Community Care Center was to notify in case of emergency, and that Archie told a neighbor on two occasions that Archie was grateful for financial and business advice given him by Linda and Dale.

Plaintiffs maintain that because of the confidential relationship there was a presumption that Linda and Dale exerted undue influence on Archie to create Linda's interest in account number 15–368–0 and certificate of deposit number 15217, and Dale's interest in certificates of deposit number 17261 and 18216. Plaintiffs insist that the burden was on Linda and Dale to rebut the presumption. The *Patterson* cases, as we read them, are supportive of plaintiffs' argument.

In a later case, however, the Supreme Court of Missouri articulated a different rule. *Davis v. Pitti*, 472 S.W.2d 382 (Mo. 1971), was an action to cancel a deed for sundry reasons including undue influence. The Supreme Court stated:

"Some Missouri cases have held that where a confidential relationship exists and a deed or will is made favoring the one acting in a fiduciary capacity, a presumption of undue influence arises, and that the burden is upon that person to rebut the presumption. *In re Patterson's Estate*, Mo., 348 S.W.2d 6; *Holland v. Anderson*, Mo., 196 S.W.2d 175. However, the majority of our cases hold that in addition to the confidential relationship there must be some evidence

from which the Court can infer undue influence; if such a presumption arises, the defendant may rebut it; if there is no rebuttal the presumption is conclusive; if there is, the question then becomes one of fact for resolution by the trial court." *Davis,* 472 S.W.2d at 388.

The Supreme Court in *Davis* went on to say:

"We adopt the view that there should be, in addition to a fiduciary relation, some evidence from which undue influence may be inferred." *Id.* at 388[8].

While *Davis* involved a deed rather than a joint account in a financial institution, the rule adopted in *Davis* has subsequently been applied in cases involving assets of the latter type. *Godsy v. Godsy,* 504 S.W. 2d 209, 213[6] (Mo.App.1973), four bank certificates of deposit and a checking account; *Obermoeller v. Speck,* 544 S.W.2d 21, 23[2] (Mo.App.1976), three accounts in savings and loan associations; *Estate of Linck,* 645 S.W.2d 70, 75[5] (Mo.App.1982), certificates of deposit and bank accounts; *In re Estate of Hayes,* 658 S.W.2d 956, 958[4] (Mo.App.1983), two bank certificates of deposit; *Lesh v. Lesh,* 718 S.W.2d 529, 533[6] (Mo.App.1986), joint account in credit union; *Estate of Brown v. Fulp,* 718 S.W.2d 588, 595 (Mo.App.1986), bank certificates of deposit.

■ Undue influence is defined as influence which, by force, coercion or overpersuasion destroys the free agency of the grantor to act. *Davis,* 472 S.W.2d at 387[6]; *Obermoeller,* 544 S.W.2d at 23–24[2]. In actions to cancel deeds because of undue influence the Supreme Court of Missouri has held that the party seeking cancellation bears the burden of proving by clear, cogent and convincing evidence that the deed was executed by reason of undue influence. *Gaugh v. Webster,* 297 S.W.2d 444, 448[2–4] (Mo.1956); *Early v. Koelbel,* 273 S.W.2d 312, 317[2] and [5] (Mo.1954). The Missouri Court of Appeals has applied the same rule in actions involving joint accounts in financial institutions. *Lesh,*

---

**4.** A confidential relationship exists when one relies upon and trusts another in regard to the handling of property and business affairs, thus

creating some fiduciary obligation. *Davis v. Pitti,* 472 S.W.2d 382, 387[5] (Mo.1971).

718 S.W.2d at 532[2]; *Daniels v. Champion*, 592 S.W.2d 869, 869 (Mo.App.1979). Plaintiffs, in their brief, tacitly acknowledge they had the burden of proving that Linda's interest in account number 15–368–0 and certificate of deposit number 15217, and Dale's interest in certificates of deposit number 17261 and 18216, were created by Archie as a result of undue influence by Linda or Dale. We shall proceed on that premise.

■ The trial court, as noted earlier, held that although a confidential relationship existed between the Allisons and Archie, plaintiffs failed to prove that the Allisons exerted undue influence on Archie. We cannot determine whether the trial court reached the latter conclusion because (a) the evidence apart from the confidential relationship was insufficient to support an inference of undue influence, or (b) there was sufficient evidence to support such an inference which, coupled with the confidential relationship, gave rise to the presumption of undue influence, but such presumption was overcome by evidence favorable to the Allisons.

We are mindful, of course, that credibility of witnesses and the weight to be given their testimony was for the trial court, *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App.1985); *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App. 1983), which was free to believe none, part or all of the testimony of any witness. *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 206[8] (Mo.App.1984); *Lohrmann v. Carter*, 657 S.W.2d 372, 377 (Mo.App.1983). We assume the trial court believed the testimony and evidence consistent with its judgment. *McComas v. Umlauf*, 641 S.W.2d 809, 812[5] (Mo.App.1982); *McClelland v. Williamson*, 627 S.W.2d 94, 96[2] (Mo.App.1982).

It is arguable that there was, apart from the confidential relationship, insufficient evidence to support an inference of undue influence. As explained *supra*, even when a confidential relationship exists there must be evidence from which the exercise of undue influence by the recipient over the donor may be inferred before the presumption of undue influence arises. *Davis*, 472 S.W.2d at 388[8]; *Obermoeller*, 544 S.W.2d at 23[2].

For the reasons that follow we have concluded it is unnecessary to determine whether there was evidence supportive of an inference of the exercise of undue influence which, coupled with the confidential relationship, would have given rise to the rebuttable presumption of undue influence, because even if there was, the evidence favorable to the Allisons was more than sufficient to rebut such presumption.

Except for Carol Reed, all of the employees of Tri–County who handled the changes in account number 15–368–0 and the issuance of the three certificates of deposit in dispute testified that Archie was fully aware of what he was doing when he engaged in those transactions. Ms. Reed, who issued money market certificate number 15217 on April 2, 1983, four months before Archie entered Community Care Center, was not asked about his mental condition. The evidence established that Archie initiated the contact with Tri–County on every occasion, either coming there himself or phoning from Community Care Center, and that neither Linda nor Dale was present when any of the transactions occurred.

Linda testified Archie was an independent, strong-willed person and that she had nothing to do with the issuance of any of the certificates of deposit or the changes in account number 15–368–0. Dale testified that except when Archie was sick his mental condition was very good up until the time he died. Dale avowed he was unaware of the changes in account number 15–368–0 or the issuance of any of the certificates of deposit until after those transactions had taken place.

It must also be remembered that more than three years elapsed after Dortha's death before Archie entered Community Care Center. Dale testified that although Archie was disturbed by Dortha's death his activities remained about the same. Dale added, "He played golf every day." According to Dale, Archie continued playing golf until just before he entered Community Care Center. Although Archie's eye-

sight was poor, Dale recalled Archie could read large print and had his driver's license renewed in 1981 or 1982.

Kay Harper, administrator of Community Care Center, confirmed Linda's testimony that Archie wrote his own checks to the Center until the last few months of his life. Ms. Harper characterized Archie as a very strong person. She explained, "He was a retired farmer, very honest, very easy to talk to, good disposition, got along well with the other residents, he wasn't—he was never a problem person." She added that until the last few weeks of his life Archie was oriented as to places and persons, but it was not unusual for him to be confused as to time. His periods of confusion were generally short and occurred during physical illness.

Nurse Russell, in response to a request that she describe Archie's mental condition during his three years at Community Care Center, responded:

"In my opinion he was always oriented to person and place. He always knew where he was. He knew he was in the nursing home. He knew he was in El Dorado Springs. He knew who he was. He always knew Dale and Linda. Some of the other nieces and nephews that came to visit, he would not know. If he were in this room with us, I doubt if he could have identified me other than he knew he had seen me before, but he would know anyone that was important to him. He ate well. He, most of the time he didn't—he wasn't confused."

Even Helen Hawkins, one of the plaintiffs, testified on deposition that Archie's mental condition in July, 1986, was good.

Plaintiffs argue that Archie was "physically, mentally and emotionally weak and disturbed" when he made Linda a joint tenant of account number 15–368–0. The argument is based on the testimony of Dale and Ruby Everson, a niece of Dortha and cousin of Archie. Dale, as noted above, acknowledged Archie was disturbed by Dortha's death, but denied Archie was extremely distraught or experienced a period of "strong grief." Ruby testified Archie was very disturbed because of Dortha's final illness and death, as his health

was much worse than hers. According to Ruby, Archie could not understand why Dortha died when her health was seemingly good. Ruby, so she said, visited Archie frequently "because he was so distraught."

Plaintiffs also emphasize that the final two money market certificates were created while Archie was a patient at Community Care Center, and that the last one was issued only a few days after the incident of September 27, 1985, when he was completely confused and walking around unclothed. Plaintiffs maintain the records at Community Care Center are the best evidence of Archie's mental condition while there, and that the records reflected a diagnosis of organic brain syndrome October 11, 1983, and senile dementia January 20, 1984.

Plaintiffs remind us that Ruby Everson testified, "I think I remember [Dale] saying to me we finally got Linda's name [on the checking account] so she could write checks, which was a help." According to Ruby, Dale said this after Archie died. Plaintiffs assert that account number 15–368–0 began with a small balance, and that Linda and Dale turned it into an account of substantial size by funneling most of Archie's income into it, thereby building a large sum for their benefit.

Under all the facts and circumstances, say plaintiffs, the trial court erred in ruling against them on the issue of undue influence.

Plaintiffs must remember, however, that the Allisons' evidence showed Archie's social security benefits went into the account by direct deposit, and that Archie himself endorsed almost all of the checks deposited in the account. The Allisons' evidence also showed that the account was used to pay Archie's bills including Community Care Center. Such evidence, if believed, refutes plaintiffs' charge that the Allisons "funneled" Archie's income into the account to establish a large sum for their ultimate benefit.

Plaintiffs must likewise remember the trial court was not obliged to believe the testimony of Ruby Everson regarding the statement allegedly made by Dale, or Ruby's testimony that Archie was distraught after Dortha's death.

It is also noteworthy that except for the incident of September 27, 1985, there was no record of bizarre behavior by Archie until the summer of 1986, several months after the final money market certificate had been issued. While the record of October 12, 1985, at Community Care Center stated Archie had been confused approximately 50 per cent of the time that month, Nurse Russell, who saw Archie five days a week, denied he was confused to that extent. As noted earlier, she recalled Archie watching the 1985 World Series on television and knowing who was playing.

Additionally, we cannot overlook the fact that while Archie depended on the Allisons to assist him in making deposits and writing checks, he never gave either of them a power of attorney. Furthermore, there was a checking account with a balance exceeding $27,000 in Archie's sole name in a bank in Schell City at the time Archie died. That account was one of the assets making up Archie's estate which, as reported earlier, was appraised in excess of $311,000.

Having scrutinized the record, we cannot say the trial court's determination that the evidence failed to establish the Allisons exerted undue influence upon Archie was unsupported by substantial evidence or against the weight of the evidence, particularly in view of the testimony of Tri–County employees Leola Bland, Ronald M. Sewell, Brenda Beaty and Carolyn L. Chism, and Community Care Center officials Kay Harper and Judith Russell. Their testimony, coupled with the testimony of Linda and Dale, amply supported the trial court's finding.

No error of law appears, and there is no contention that § 362.470, RSMo 1978, was not complied with regarding any of the assets in dispute.

Judgment affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.